# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life    )
Term Parole Consideration    )        CDC Number E-05222
Hearing of:                  )
                             )
GREGORY SANDERS              )
_____  )


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

SEPTEMBER 21, 2006

1:45 P.M.

PANEL PRESENT:

Ms. Linda Shelton, Presiding Commissioner
Ms. Joan Thompson, Deputy Commissioner

OTHERS PRESENT:

Mr. Gregory Sanders, Inmate
Ms. Johanna Hoffmann, Attorney for Inmate
Ms. Lybia Liu, Deputy District Attorney
Correctional Officers, Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No        See Review of Hearing
_____    Yes       Transcript Memorandum



**Carol Folk   Northern California Court Reporters**

ii

<u>INDEX</u>

| | <u>Page</u> |
|---|---|
| Proceedings...................................... | 1 |
| Case Factors.................................... | 12 |
| Pre-Commitment Factors.......................... | 20 |
| Post-Commitment Factors......................... | 30 |
| Parole Plans.................................... | 39 |
| Closing Statements.............................. | 62 |
| Recess.......................................... | 72 |
| Decision........................................ | 73 |
| Adjournment..................................... | 87 |
| Transcriber Certification....................... | 88 |

--oOo--

1

1    **P R O C E E D I N G S**

2    **PRESIDING COMMISSIONER SHELTON:**  All right.  Good

3    afternoon, everyone.  We are here for a subsequent parole

4    consideration hearing for Gregory Sanders, CDC number E-

5    05222. Today's date is September 21st, 2006, and the time

6    is 1:45 p.m.  We are located at San Quentin State Prison.

7    Mr. Sanders was received on that same date, 9/21/06 --

8    Mr. Sanders was received on 1/5/89 committed from San

9    Bernadino County and his life term began that same date,

10   1/5/89.  He has a minimum eligible parole date of

11   10/1/98.  Controlling offense for which Mr. Sanders is

12   committed is set forth in Case number BCR1231 charging

13   Count One violation PC 187, Murder in the Second Degree

14   with a 12022(b), use of a handgun.  Mr. Sanders received

15   a term of fifteen plus one, equaling 16 years to life.

16   All right, Mr. Sanders, we are tape recording this

17   hearing so we are going to go around the room and

18   introduce ourselves, say our first name, last name, spell

19   our last name and when we get to you I'd like you to add

20   your CDC number.

21   **INMATE SANDERS:**  Yes, ma'am.

22   **PRESIDING COMMISSIONER SHELTON:**  My name is Linda

23   Shelton, S-H-E-L-T-O-N, Commissioner.

24   **DEPUTY COMMISSIONER THOMPSON:**  And my name is

25   Joan Thompson, T-H-O-M-P-S-O-N, Deputy Commissioner.

26   **PRESIDING COMMISSIONER SHELTON:**  Miss Liu?

27   **DEPUTY DISTRICT ATTORNEY LIU:**  My name is Lybia

2

1  Liu, L-Y-B-I-A, last name L-I-U.  I am a Deputy District

2  Attorney for San Bernardino County representing the

3  people.

4      **PRESIDING COMMISSIONER SHELTON:**  Sir?

5      **INMATE SANDERS:**  Oh, I'm sorry.  Gregory L.

6  Sanders, S-A-N-D-E-R-S, E-05222.

7      **ATTORNEY HOFFMANN:**  Johanna Hoffmann,

8  H-O-F-F-M-A-N-N, Attorney for Mr. Sanders.

9      **PRESIDING COMMISSIONER SHELTON:**  Thank you. And

10  for the record we have two officers in the room for

11  security purposes who will not be participating in

12  today's hearing.  All right.  Mr. Sanders, first business

13  will be discussing any accommodations necessary for

14  disabilities.  You signed a BPT Form 1073 on July 6th,

15  2006, indicating that you had no disabilities.  You are

16  wearing glasses.

17      **INMATE SANDERS:**  Yes, ma'am.

18      **PRESIDING COMMISSIONER SHELTON:**  Are they

19  prescription glasses?

20      **INMATE SANDERS:**  Yes, ma'am, they are.

21      **PRESIDING COMMISSIONER SHELTON:**  And does the

22  prescription work for you?

23      **INMATE SANDERS:**  Yes, ma'am.

24      **PRESIDING COMMISSIONER SHELTON:**  They meet all

25  your visual needs?

26      **INMATE SANDERS:**  Yes, ma'am.

27      **PRESIDING COMMISSIONER SHELTON:**  And as well, a

3

1   couple of questions for the record.  You also signed

2   Accommodation for Disabilities Form, Exhibit 2 today,

3   Outline of Hearing Procedure as well.  Do you have any

4   hearing problems?

5       **INMATE SANDERS:**  A little bit.  I have a little

6   bit of hard of hearing out of my right ear, but I

7   compensate for it by just turning my head.

8       **PRESIDING COMMISSIONER SHELTON:**  Okay.  If you

9   cannot hear anything we say today, let me know.  I'm not

10  sure if this institution has a hearing assistance device.

11  We do.  But you don't think it's necessary?

12      **INMATE SANDERS:**  No, ma'am.  I can hear plenty

13  well as long as I keep my head turned a little bit.

14      **PRESIDING COMMISSIONER SHELTON:**  Okay.

15      **INMATE SANDERS:**  Just the background that affects

16  me like the fan running and stuff, but that's it.

17      **PRESIDING COMMISSIONER SHELTON:**  Well, let me

18  know if we need to repeat something.

19      **INMATE SANDERS:**  Okay.

20      **PRESIDING COMMISSIONER SHELTON:**  Any issues with

21  mobility, walking, standing, sitting for a length of

22  time?

23      **INMATE SANDERS:**  No, ma'am.  None.

24      **PRESIDING COMMISSIONER SHELTON:**  So you're

25  comfortable?

26      **INMATE SANDERS:**   Yes.

27      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Are you

4

1    taking any medications, sir?

2         **INMATE SANDERS:**  Yes, ma'am, I do.  I take high

3    blood pressure medicine.  I take high cholesterol

4    medicine.  The doctor also has me on a child safety

5    aspirin a day.

6         **PRESIDING COMMISSIONER SHELTON:**  Is that so you

7    can't open the top?  Just kidding.  I like the child

8    safety caps because I can never get them open myself.  No

9    medication for -- no like psychotropic meds or

10   anything that makes your head all cloudy or --

11        **INMATE SANDERS:**  No, ma'am.  I have no mental

12   health issues.

13        **PRESIDING COMMISSIONER SHELTON:**  Okay.  So you're

14   comfortable with moving forward?

15        **INMATE SANDERS:**  Yes, ma'am.

16        **PRESIDING COMMISSIONER SHELTON:**  Counsel, you

17   would concur?

18        **ATTORNEY HOFFMANN:**  Yes, ma'am.  Thank you.

19        **PRESIDING COMMISSIONER SHELTON:**  All right.

20   Thank you.  You've been here before, Mr. Sanders.  Why

21   don't you tell us in your mind what this hearing is all

22   about?

23        **INMATE SANDERS:**  This hearing is to determine my

24   suitability for parole and if I meet the criteria for the

25   suitability of parole to be released upon parole, to

26   determine whether I have properly come to terms with

27   insight into the reason for the crime, to understand how

5

1    it could come to be and how to prevent it from ever

2    happening in the future.

3            **PRESIDING COMMISSIONER SHELTON:**  Good answer.

4            **INMATE SANDERS:**  Thank you.

5            **PRESIDING COMMISSIONER SHELTON:**  All right, sir,

6    you have certain rights.  Those rights include the right

7    to a timely notice of this hearing, the right to review

8    your Central File and a right to present relevant

9    documents.  Counsel, have we met these rights thus far?

10           **ATTORNEY HOFFMANN:**  They have been met to the

11   best of my knowledge.  Thank you.

12           **PRESIDING COMMISSIONER SHELTON:**  Thank you. Sir,

13   you also have an additional right to be heard by an

14   impartial Panel.  Today it would be Commissioner Thompson

15   and myself.  Is that all right with you?

16           **INMATE SANDERS:**  Yes, ma'am, perfectly fine.

17           **PRESIDING COMMISSIONER SHELTON:**  All right.

18   Thank you.  I also want to let you know that a couple of

19   years ago the regulations regarding your right to appeal

20   hearings were changed, so if you need additional

21   information talk with your attorney or visit the prison

22   law library.

23           **INMATE SANDERS:**  Yes, ma'am.

24           **PRESIDING COMMISSIONER SHELTON:**  Now sir, you are

25   not required to admit to or discuss your offense.

26   However this Panel does accept as true the findings of

27   the court.  Do you know what that means?

6

1          **INMATE SANDERS:**  Not really.

2          **PRESIDING COMMISSIONER SHELTON:**  It means what

3   the court said happened is what we're going by.

4          **INMATE SANDERS:**  Okay.

5          **PRESIDING COMMISSIONER SHELTON:**  The reason being

6   is we're not here to retry your case.

7          **INMATE SANDERS:**  Yes, ma'am.

8          **PRESIDING COMMISSIONER SHELTON:**  We're here to

9   talk about your suitability for parole.  So in your

10  particular case the court found you guilty of a second

11  degree murder. We're not here to discuss whether that was

12  a first degree murder or manslaughter. We're here to

13  discuss circumstances and what have you done.

14         **INMATE SANDERS:**  Yes, ma'am.

15         **PRESIDING COMMISSIONER SHELTON:**  And again,

16  you're not required to admit to or discuss the offense,

17  okay?  Commissioner, do we have any confidential

18  information?

19         **DEPUTY COMMISSIONER THOMPSON:**  There is

20  confidential information in the file, but it will not be

21  used at this hearing.

22         **PRESIDING COMMISSIONER SHELTON:**  Thank you.  I

23  have already passed the hearing checklist marked Exhibit

24  1 to Miss Hoffmann and she signed and dated indicating

25  she has all the documents necessary to move forward.

26  Miss Liu, do you have everything you need to move

27  forward?

7

1          **DEPUTY DISTRICT ATTORNEY LIU:**  Yes, I do.

2          **PRESIDING COMMISSIONER SHELTON:**  All right.

3    Thank you.

4          **ATTORNEY HOFFMANN:**  Why don't I just add to that

5    that I do have all the documents necessary to move

6    forward, but I do not have all of the documents checked

7    on that exhibit list and --

8          **PRESIDING COMMISSIONER SHELTON:**  Okay.

9          **ATTORNEY HOFFMANN:**  -- where those documents were

10   absent I noted on the exhibit list.

11         **PRESIDING COMMISSIONER SHELTON:**  Well, yes.

12         **ATTORNEY HOFFMANN:**  Including the probation

13   officer's reporting and sentencing transcripts which are

14   not in fact in the file but they are checked on the

15   exhibit one.

16         **PRESIDING COMMISSIONER SHELTON:**  Okay.  I think

17   there was a confusion --

18         **DEPUTY DISTRICT ATTORNEY LIU:**  With respect --

19         **PRESIDING COMMISSIONER SHELTON:**  I'm sorry?

20         **DEPUTY DISTRICT ATTORNEY LIU:**  Yeah.  With

21   respect to the -- I'm sorry -- with respect to the

22   probation officer's report there -- this issue came up

23   before -- there was never any.  I believe you waived it.

24         **PRESIDING COMMISSIONER SHELTON:**  We understand

25   that.

26         **ATTORNEY HOFFMANN:**  Right.

27         **PRESIDING COMMISSIONER SHELTON:**  It was just --

8

1    it was marked on this format and I think there was a

2    confusion about the sentencing transcripts as well.  But

3    for the record, the last hearing had been postponed with

4    regards to a request for a probation officer report and

5    yes, that was waived.  There was no probation officer

6    report --

7        **INMATE SANDERS:**  No, ma'am.  I waived that at

8    sentencing.

9        **PRESIDING COMMISSIONER SHELTON:**  Yes.

10   Unfortunately nobody bothered to ask you that I guess at

11   the last hearing because it was postponed because of that

12   reason.

13       **INMATE SANDERS:**  I tried to explain it but it

14   didn't work.

15       **PRESIDING COMMISSIONER SHELTON:**  That's because

16   you weren't talking to probation people.  All right.

17   Counsel, are there any additional documents to be

18   submitted?

19       **ATTORNEY HOFFMANN:**  Not that I know of, but if it

20   comes to my attention that you do not have some documents

21   that are relevant I reserve the right to submit them at a

22   later time.

23       **PRESIDING COMMISSIONER SHELTON:**  Not a problem.

24   Are there any preliminary objections?

25       **ATTORNEY HOFFMANN:**  I do in my file under the

26   Notices and Responses section have an October 12th, 2005,

27   letter from Lieutenant -- as well as a November 29th,

9

1    2005, letter from Lieutenant Michael Lenihan --

2    L-E-N-I-H-A-N.  There is a more current April 2006 letter

3    so I'd like to request that given that these letters are

4    over a year old they not be considered at this hearing.

5          **PRESIDING COMMISSIONER SHELTON:**  They probably

6    wouldn't be anyway.

7          **ATTORNEY HOFFMANN:**  Thank you.

8          **PRESIDING COMMISSIONER SHELTON:**  If we have a

9    more current letter we will refer to the current letter.

10         **ATTORNEY HOFFMANN:**  Thank you.  The additional

11   objection that I would just like to note for the record

12   is a delay in the timeliness of hearings for Mr. Sanders.

13   He has a minimum eligible parole date of October 10th --

14   I'm sorry, October 1st, 1998, meaning that his initial

15   hearing should have been held sometime around October of

16   1997 and it was in fact held September 29th of '97.  He

17   was given a three year denial. However, his next hearing

18   was not held at any point within 2000 and it was instead

19   held on June 20th of 2001 at which point he received

20   another two year -- or he received a two year denial

21   placing his next hearing at June 18th, 2003, receiving

22   another two year denial placing his next hearing

23   somewhere around June of 2005.  Instead of having a

24   hearing in June of 2005 that hearing was postponed.

25         **PRESIDING COMMISSIONER SHELTON:**  Right.

26         **ATTORNEY HOFFMANN:**  Mr. Sanders can you state the

27   reason that hearing was postponed?

10

1          **INMATE SANDERS:**  The June 2005 hearing?

2          **ATTORNEY HOFFMANN:**  Yes.

3          **INMATE SANDERS:**  They just kind of blew by it

4     like it didn't exist.

5          **ATTORNEY HOFFMANN:**  Okay.  So it was simply not

6     calendared (inaudible) --

7          **PRESIDING COMMISSIONER SHELTON:**  Excuse me.  Who

8     blew by what?

9          **ATTORNEY HOFFMANN:**  I'm going to explain that.

10         **PRESIDING COMMISSIONER SHELTON:**  All right.

11         **ATTORNEY HOFFMANN:**  Because I understand what

12    that meant.  That hearing was simply not calendared in

13    June 2005.  Instead Mr. Sanders was placed on the

14    December 2005 calendar.

15         **INMATE SANDERS:**  Yes.

16         **ATTORNEY HOFFMANN:**  And at the time he went in

17    then to sign for his paperwork and receive his parole

18    date in December of 2005, he went through and signed all

19    the paperwork accepting that date, accepting all the

20    paperwork and updated Board reports and psych

21    evaluations.  His counselor I believe then handed him a

22    form indicating that there was a 30-day postponement to

23    January of 2006.  So now we're almost -- we're about nine

24    months past when his hearing should have happened.  In

25    January of 2006 -- January 10th specifically -- Mr.

26    Sanders' hearing was then postponed again because

27    necessary documents including the Board report and psych

11

1   evaluation were not available.  Thereafter his hearing

2   was scheduled for May 10th of 2006, and as we discussed

3   already that hearing was postponed because no probation

4   officer's report or appellate summary decisions were

5   available.  As noted neither existed.  So I bring that to

6   the Panel's attention because Mr. Sanders should have had

7   this current parole hearing somewhere around the middle

8   of June in 2005, so we're now over a year delayed for his

9   hearing.  Thank you.

10      **PRESIDING COMMISSIONER SHELTON:**  Gee, I sure

11  appreciate all that information.  Unfortunately, Mr.

12  Sanders is not the only one that has late scheduled

13  hearings these days and we are doing our best to catch

14  up.  Okay, moving forward.  Miss Hoffman, will your

15  client be speaking with us today?

16      **ATTORNEY HOFFMANN:**  Yes, he will be.

17      **PRESIDING COMMISSIONER SHELTON:**  With regards to

18  all matters?

19      **ATTORNEY HOFFMANN:**  Yes.

20      **PRESIDING COMMISSIONER SHELTON:**  Okay.  And Mr.

21  Sanders, would you please raise your right hand?  Do you

22  solemnly swear or affirm that the testimony you give at

23  this hearing will be the truth, the whole truth and

24  nothing but the truth?

25      **INMATE SANDERS:**  Yes, ma'am.

26      **PRESIDING COMMISSIONER SHELTON:**  Terrific.  What

27  we are going to do next is discuss the summary of the

12

1    offense, your prior record and your social history.  I am
2    going to enter in a summary of your commitment offense
3    and then I would like you to share with us what was going
4    on with you at that time, all right?
5        **ATTORNEY HOFFMANN:**  That was taken care of by the
6    form that we (inaudible).
7        **INMATE SANDERS:**  Yes, ma'am.
8        **PRESIDING COMMISSIONER SHELTON:**  Okay.  I am
9    going to refer to December 6, 2006 Board report.  Offense
10   summary indicates:
11           "At the time of the incident offense
12           Sanders and his wife Shawnee were
13           separated.  His estranged wife and her
14           boyfriend were staying with her mother at
15           her mother's mobile home. Sanders had been
16           living away from the area but had returned
17           to the area with his son to sort things out
18           with his estranged wife Shawnee. During
19           this time Sanders was also staying in Mrs.
20           Hobbs' mobile home.  On the day of the
21           murder Sanders left the mobile home for a
22           while.  When he returned he went directly
23           to the bedroom that Shawnee and her
24           boyfriend, Larry Steinbring (phonetic) were
25           sharing.  Sanders entered the bedroom and
26           shot both victims.  Mrs. Hobbs heard the
27           first shots and went to the room.  She

13

1            witnessed Sanders shoot Steinbring a second

2            time and then shoot her daughter.  Sanders

3            fled the scene and was later arrested by

4            the sheriff's office helicopter crew.

5            Steinbring died at the scene.  Shawnee

6            survived."

7  All right, sir, why don't you tell us what happened.

8  From your perspective what was going on that day?

9        **INMATE SANDERS:**  Alex and I, we had got up that

10  morning --

11        **PRESIDING COMMISSIONER SHELTON:**  Alex?

12        **INMATE SANDERS:**  My son Alex.  The day before --

13  let me go back to the day before -- the day before

14  Shawnee had been quiet and reserved and worried about

15  something all day long and I finally just, just tell me

16  what's wrong.  And she had neglected to tell me that when

17  she notified me that she wanted to get back together

18  again, she had neglected to tell me that she wanted to

19  get back together with me and her boyfriend.  And when I

20  found that out I was absolutely and positively set

21  against it.  It just wasn't going to happen.  She tried

22  numerous ways to convince me to either stay as a

23  threesome or to leave my son Alex and go away and let her

24  raise Alex. That wasn't going to happen.  She wanted to

25  go out to dinner that night to say goodbye, whatever.  I

26  was hesitant to do it but I decided to do it because

27  maybe she had something intelligent to say.  We went out

14

1    to dinner.  She again tried to initiate the request that

2    we stay together as a family with an extra member.  I

3    wasn't going to do that.  She got mad.  The best way to

4    sum it up is that she was angry that she couldn't have

5    her cake and eat it too and I said, that's it, I'm

6    leaving, I'm not having nothing more to do with this.

7    The next morning we got up, Alex and I.  We'd gone into

8    town.  I was going to go down to the local job department

9    down there and find out in particular what jobs were

10   available in the Southern California area which I was

11   familiar with because I was stationed there when I was in

12   the Marine Corp.  I was going to find a job down there on

13   one of the either local or interstate railroads and raise

14   Alex, my son -- I was a single parent -- raise him down

15   there by myself and just continue to live our lives on

16   what they were.

17        **PRESIDING COMMISSIONER SHELTON:**  How old was

18   Alex?

19        **INMATE SANDERS:**  Four.  After we had got done

20   going to the welfare office to find some kind of daycare

21   for Alex so I could go out and look at these job markets,

22   we were going to go to McDonald's and have a Happy Meal.

23   So we went to the McDonald's and we ordered the meal and

24   we went over and sat down at the table and I went to pick

25   him up and set him in his high chair and he darn near

26   cringed and started crying and I asked him what was

27   wrong.  He said his arm hurts.  I took his jacket off and

15

1    on his arm was a great big huge handprint and I asked him
2    what happened.  And he said that Larry had hurt him.  And
3    I asked him in what way.  He said, while Shawnee and I
4    were out to dinner Larry and he -- Alex -- had been
5    outside and he's -- my son told me that Larry was trying
6    to make him tell me to go away and leave him with Shawnee
7    and Larry and I just -- I got angry.  I drove home.  I
8    was going to confront Larry and Shawnee and ask him in
9    what way, shape or form were they abusing my son.  I was
10   going to do whatever necessary to get out of that area
11   immediately.  I was short on cash because I hadn't made
12   it to the bank.  I had forgot to go while I was there in
13   town.  But Larry and some neighbors there had pawned guns
14   before in town and I was just going to give Larry a
15   pistol to pawn it and I was going to take the cash and
16   drive to the Barstow or the next largest town to get out
17   of the area.  I didn't want no part of that family any
18   more.  When I walked into the room to talk to Larry about
19   introducing me to Jimmy so we could go sell the guns --
20   Jimmy was the neighbor who knew the pawn smith in town --
21   they -- I wouldn't say "they" -- but Larry laughed at me.
22   He give -- he had a smirk on his face like, okay, you
23   win, you know, and I just wasn't going to -- I wasn't
24   going to settle for that, and I just asked him, you know,
25   you want to help me pawn this gun and get out of town?
26   And then he just got this smile on his face like, you
27   know, I've got yours now and it stung.  You know, I

16

1  was -- he shocked -- he hurt my pride, he hurt my vanity

2  and I can't really say he hurt Alex and I think that was

3  probably the chief factor of why I just erupted enraged

4  and I shot him.

5       **PRESIDING COMMISSIONER SHELTON:** From what I

6  understand, you found he and your estranged wife in bed

7  together?

8       **INMATE SANDERS:** They were laying in bed just --

9       **PRESIDING COMMISSIONER SHELTON:** And you shot

10 him?

11      **INMATE SANDERS:** Yes.

12      **PRESIDING COMMISSIONER SHELTON:** Why'd you shoot

13 her?

14      **INMATE SANDERS:** Just angry, angry that I'd been

15 deceived, lied to, cuckold, used, manipulated.

16      **PRESIDING COMMISSIONER SHELTON:** Is it

17 traditional to take a loaded weapon to a pawn shop?

18      **INMATE SANDERS:** No, ma'am.

19      **PRESIDING COMMISSIONER SHELTON:** Why was this gun

20 loaded?

21      **INMATE SANDERS:** My guns were always loaded.

22      **PRESIDING COMMISSIONER SHELTON:** Why?

23      **INMATE SANDERS:** Empty weapon (inaudible) nobody.

24      **PRESIDING COMMISSIONER SHELTON:** A full one could

25 kill a four year old child.

26      **INMATE SANDERS:** Yes, ma'am.  I had them locked

27 up away from him.

17

1        **PRESIDING COMMISSIONER SHELTON:**  And where was he

2    when you shot --

3        **INMATE SANDERS:**  He was in the yard.

4        **PRESIDING COMMISSIONER SHELTON:**  I guess I have a

5    problem with this instant eruption.  You know, if you

6    were in the Marines and you were trained and disciplined

7    how much could you have handled this situation

8    differently when you first saw the marks on your son's

9    arm?

10        **INMATE SANDERS:**  To understand the anger of what

11    I had about my son being abused, I'm going to go back to

12    when my daughter Carrie, who's now 34, when she was 13-

13    years old some man tried to attack her in a pool in

14    Peoria, Arizona and we come to find out that the man was

15    a known sexual deviant.  After Alex was born, my wife

16    Catherine at the time, after Alex was born, she hung

17    around for about three days and then she come in one day

18    and announced that she couldn't be a wife and a mother

19    and took off and she was gone for two and a half years.

20    But in that two and a half years because her family

21    thought that I had treated her bad, I was turned in to

22    the Coconino County Child Protective Services probably a

23    total of no less than 16 times for abusing Alex, for

24    spreading communicable diseases, for being an AIDs

25    carrier or being a syphilis carrier.  And finally my boss

26    told me one day, he says, you know what, you got to stop

27    this.  So I went down and talked to my attorney and he

18

1   suggested that I, you know, change locales, go somewhere

2   else and that's when I ended up moving to Phoenix.  Well,

3   it didn't seem to stop much down there because it still

4   they tried to get me every time I turned around.  And the

5   one other instance of my daughter being abused is that

6   her stepfather one time was abusing her and her

7   girlfriend and I had just -- the accumulation of having

8   my children abused finally reached its breaking point.

9           PRESIDING COMMISSIONER SHELTON:  Your daughter is

10  the sister to Alex?

11          INMATE SANDERS:  No.  Alex is a stepson -- or

12  stepbrother to Carrie.

13          PRESIDING COMMISSIONER SHELTON:  So Carrie, your

14  daughter, is from a different wife?

15          INMATE SANDERS:  Carrie, Michael and George are

16  from Sylvia who has since passed away last January.

17          PRESIDING COMMISSIONER SHELTON:  So you have

18  three children from Sylvia and that would be your first

19  wife?

20          INMATE SANDERS:  Yes.  Alex is from my second

21  wife and then none from Shawnee.

22          PRESIDING COMMISSIONER SHELTON:  Okay.  So Alex

23  did not belong to Shawnee?

24          INMATE SANDERS:  No, ma'am.

25          PRESIDING COMMISSIONER SHELTON:  So why would

26  they want him?

27          INMATE SANDERS:  You want me to be brutally

19

1  honest or just theorize?

2      **PRESIDING COMMISSIONER SHELTON:**  Well, I prefer

3  honesty but not 20 minutes worth of it.

4      **INMATE SANDERS:**  I think they wanted to use him

5  for a meal ticket.

6      **PRESIDING COMMISSIONER SHELTON:**  For welfare?

7      **INMATE SANDERS:**  Yeah.

8      **PRESIDING COMMISSIONER SHELTON:**  How do you feel

9  about what you did?

10     **INMATE SANDERS:**  Horrible.  I have gone through

11 many, many phases of trying to get over what I've done to

12 try to make amends to the family, to try to apologize to

13 the family, to just let them know that my heart is broke

14 as much as their heart is broke.  The things I did are so

15 horrible it's hard to even consider that there's any

16 excuse whatsoever for doing it.  I don't feel good about

17 it.  I'll never feel good about it.  But I'm going to try

18 to apologize to the family for destroying their father,

19 their brother, their uncle.  I'm just --

20     **PRESIDING COMMISSIONER SHELTON:**  What kind of

21 injuries did Shawnee sustain?

22     **INMATE SANDERS:**  I know she got shot in the

23 stomach and shot in the leg.  Those are the physical

24 injuries.  The hurt and the psychological damage will

25 probably never go away.

26     **PRESIDING COMMISSIONER SHELTON:**  Have you had any

27 contact with her since?

20

1          **INMATE SANDERS:**  As a matter of fact I have.

2    She's written twice.

3          **PRESIDING COMMISSIONER SHELTON:**  With regards

4    to -- ?

5          **INMATE SANDERS:**  Telling me that she thinks I'm

6    the scum of the earth, I should rot in hell in prison,

7    that there's no way that I could ever, ever apologize to

8    her and at the same breath and in the same letter she

9    wants a picture of me and wants to come visit.  So it's a

10   kind of a mixed bag of what she wants.  I have the

11   letter.

12         **PRESIDING COMMISSIONER SHELTON:**  What do you

13   want?  What do you want?

14         **INMATE SANDERS:**  I would like to let her come and

15   visit under the watchful eye of the custody staff in the

16   visiting room just to look her in the eye and tell her

17   I'm sorry and apologize for destroying her life.

18         **PRESIDING COMMISSIONER SHELTON:**  All right.

19   Let's talk about your prior record.  You have no juvenile

20   record.

21         **INMATE SANDERS:**  No, ma'am.

22         **PRESIDING COMMISSIONER SHELTON:**  You have two

23   disorderly conducts in 1986.  What were those about?

24         **INMATE SANDERS:**  The one is that my mother and my

25   wife Shawnee got in a fight and to separate them I had to

26   get kind of physical between the two of them and when the

27   police arrived all they saw was me getting in the middle,

21

1  so they arrested me to diffuse the situation.  The

2  arresting officer was my very good friend.  He took me

3  downtown just to let things cool off.  He separated my

4  wife and my mother, told my mother to go outside and wait

5  and kept her inside.  He discussed it with them.  He

6  diffused that situation.

7          **PRESIDING COMMISSIONER SHELTON:**  And your other

8  incident?

9          **INMATE SANDERS:**  The other incident is Shawnee

10  had gone into town one time.  She was supposed to go to

11  the store and get some dinner.  We were out on the lake

12  camping.  We were having a barbeque.  We didn't have

13  enough charcoal and we wanted to get some more food for

14  the barbeque because we was expecting more guests.  Her

15  trip to the store after four and a half, five hours, it

16  was getting dark, I thought she'd been hurt, got in a car

17  wreck, lost, anything.  I went to look for her and found

18  her totally falling down drunk in the local bar in town.

19  I went to get her out of the bar, put her in the truck,

20  take her home.  She wanted to drive.  Absolutely not.

21  She was not going to drive in that condition.  She

22  started to beat up on me pretty severely and I slapped

23  her to stop her and about that time the police showed up

24  and they arrested me and arrested her.  They took me

25  down, booked me.  The judge fined me $70.  They arrested

26  her because she had drugs in her pocket and they give her

27  I think five or seven days in jail.

22

1        **PRESIDING COMMISSIONER SHELTON:**  All right.  Is

2    there anything I'm leaving out?  Is there anything else

3    you could think of from your prior record that's not

4    mentioned anywhere?

5        **INMATE SANDERS:**  Well, when I was kid I set the

6    field on fire one time.

7        **PRESIDING COMMISSIONER SHELTON:**  Cool.  How old

8    were you?

9        **INMATE SANDERS:**  Six.

10        **PRESIDING COMMISSIONER SHELTON:**  And I hope

11    nobody was hurt?

12        **INMATE SANDERS:**  No, ma'am.  It was way out in

13    the country.  We lived out in the country.

14        **PRESIDING COMMISSIONER SHELTON:**  Okay.  I

15    appreciate that.  Let's talk about your social history,

16    okay?

17        **INMATE SANDERS:**  Okay.

18        **PRESIDING COMMISSIONER SHELTON:**  I want to verify

19    that your birth date is November -- I have two different

20    -- 13th or 15th?

21        **INMATE SANDERS:**  3rd.

22        **ATTORNEY HOFFMANN:**  30?

23        **INMATE SANDERS:**  3rd.

24        **ATTORNEY HOFFMANN:**  Oh, 3rd.

25        **INMATE SANDERS:**  November 3rd.

26        **PRESIDING COMMISSIONER SHELTON:**  Oh, the two that

27    I have are both wrong, so that's probably good why we

23

1    verify it.  1951?

2           **INMATE SANDERS:**  Yes, ma'am.

3           **PRESIDING COMMISSIONER SHELTON:**  All right.  You

4    were born in Lafayette, Indiana?

5           **INMATE SANDERS:**  Yes, ma'am.

6           **PRESIDING COMMISSIONER SHELTON:**  You have four

7    brothers and a sister?

8           **INMATE SANDERS:**  Yes, ma'am.

9           **PRESIDING COMMISSIONER SHELTON:**  And were you the

10   only one to ever get in trouble in the family?

11          **INMATE SANDERS:**  Yes, ma'am.

12          **PRESIDING COMMISSIONER SHELTON:**  Do you have

13   contacts with your four brothers and sisters?

14          **INMATE SANDERS:**  All the time.

15          **PRESIDING COMMISSIONER SHELTON:**  Okay.  What was

16   life like growing up?  Mom and dad together?

17          **INMATE SANDERS:**  It was great.  We had -- we was

18   living out in the country.  We had everything we could

19   ever want.  We were nurtured well, we were raised well,

20   we were taught to respect our elders, to mind our P's and

21   Q's.  I was kind of like the rebellious one in the

22   family.  I was the one who always fought for my brothers

23   or protecting my sister when the boys were chasing her.

24   When my parents, they were in a real bad car wreck and

25   they were both in the hospital for a couple years, I was

26   the one who kept the other five together rather than

27   having them split up into foster homes.  I had three -- I

24

1  was going to stay with some good friends of my dad and

2  mom and I had three of us stay with my grandmother and I

3  fought tooth and hard to get the child protective

4  services to recognize that fact.

5      **PRESIDING COMMISSIONER SHELTON:**  Were you the

6  oldest?

7      **INMATE SANDERS:**  No, ma'am.  I was the next to

8  the oldest.

9      **PRESIDING COMMISSIONER SHELTON:**  Then so

10  everything was fine.  You went to school and you

11  graduated from Southwestern High School in 1969?

12      **INMATE SANDERS:**  Yes, ma'am.

13      **PRESIDING COMMISSIONER SHELTON:**  And then you

14  joined the Marines.

15      **INMATE SANDERS:**  Yes.

16      **PRESIDING COMMISSIONER SHELTON:**  And do you still

17  have that skin condition?

18      **INMATE SANDERS:**  Yes, ma'am.

19      **PRESIDING COMMISSIONER SHELTON:**  So you're

20  basically allergic to the sun?

21      **INMATE SANDERS:**  To this day I have to use sun

22  block 50 or not go out at all.

23      **PRESIDING COMMISSIONER SHELTON:**  I'm surprised

24  you lasted four years in the Marines then.

25      **INMATE SANDERS:**  I struggled there at the end.

26  They wanted to discharge me and I fought them and fought

27  them and fought them and they -- it's just a bigger

25

1    bureaucracy than I'd figured and lost.  So they finally

2    discharged me under an honorable.

3         **PRESIDING COMMISSIONER SHELTON:**  So you were

4    discharged from the Marines and then you went to work for

5    ALCOA?

6         **INMATE SANDERS:**  Uh-huh.

7         **PRESIDING COMMISSIONER SHELTON:**  What is ALCOA?

8         **INMATE SANDERS:**  Aluminum Company of America.

9         **PRESIDING COMMISSIONER SHELTON:**  Okay.  That's

10   what I thought it was but I wasn't sure.  You worked

11   there for two years and then you got laid off.  You moved

12   to Page, Arizona.

13        **INMATE SANDERS:**  Uh-huh.

14        **PRESIDING COMMISSIONER SHELTON:**  That says where

15   your wife's family lived, but when did you get married

16   the first time?

17        **INMATE SANDERS:**  1973.

18        **PRESIDING COMMISSIONER SHELTON:**  And for how long

19   were you married?

20        **INMATE SANDERS:**  Almost 13 years.

21        **PRESIDING COMMISSIONER SHELTON:**  Then you got

22   divorced in, what, '86?

23        **INMATE SANDERS:**  No.  '84, '85?  '85?

24        **PRESIDING COMMISSIONER SHELTON:**  '84?  Close

25   enough.

26        **INMATE SANDERS:**  '85, somewhere in there.

27        **PRESIDING COMMISSIONER SHELTON:**  Okay.  And you

26

1    had Carrie, Michael and George?

2            **INMATE SANDERS:**  Yes.

3            **PRESIDING COMMISSIONER SHELTON:**  So how long did

4    you live in Page, Arizona?

5            **INMATE SANDERS:**  Up until I departed and moved to

6    Phoenix.

7            **PRESIDING COMMISSIONER SHELTON:**  That's when you

8    got divorced?

9            **INMATE SANDERS:**  That's when I got divorced.  Or

10   Cathy and I had -- I had filed for divorce and Cathy

11   probably -- let's see, Alex was born the 22nd of '85 --

12   probably the end of '85, early '86 I divorced Cathy.  The

13   (inaudible) --

14           **PRESIDING COMMISSIONER SHELTON:**  You got divorced

15   from Sylvia in '85.  Then you didn't stay married to

16   Cathy very long?

17           **INMATE SANDERS:**  Sylvia and I have been separated

18   for almost a year.  I had met Cathy at a church where I

19   was attending and we had got together and she ended up

20   pregnant, so we got married.  And it was probably -- it

21   was about seven months after Alex was born that she took

22   off.  Well, probably -- when I did file for divorce on

23   grounds of abandonment and it was probably final in

24   February or March of '86.

25           **PRESIDING COMMISSIONER SHELTON:**  What kind of

26   work did you do for the Salt River Project?

27           **INMATE SANDERS:**  I was a railroad engineer.

27

1    **PRESIDING COMMISSIONER SHELTON:**  Then you moved

2    to Tennessee?

3    **INMATE SANDERS:**  Yes, ma'am.  I had moved to

4    Tennessee after a debacle with Cathy who had come back

5    after almost four years and wanted to get back together

6    in the Biblical sense, but at the time I was separated

7    from Shawnee and still legally married and I wouldn't do

8    that and she did the same thing.  She picked up the gun

9    and held me and Alex hostage for about 45 minutes until

10   we could get the Maricopa County and the Peoria SWAT

11   teams to get us out. They arrested her, sent her to jail.

12   Alex and I -- I called my attorney and asked him what I

13   should do and he said, have you ever thought about moving

14   east?  So I immediately packed up, quit my job, took my

15   retirement and went to Arizona -- or I went to Tennessee.

16   **PRESIDING COMMISSIONER SHELTON:**  And while in

17   Tennessee you collected welfare?

18   **INMATE SANDERS:**  Yes.

19   **PRESIDING COMMISSIONER SHELTON:**  For your son and

20   you.

21   **INMATE SANDERS:**  Yes.

22   **PRESIDING COMMISSIONER SHELTON:**  Then you left.

23   In '88 you left Tennessee to come to California.

24   **INMATE SANDERS:**  Uh-huh.  I was (inaudible) --

25   **PRESIDING COMMISSIONER SHELTON:**  At which point

26   in time you weren't here long before this commitment

27   offense.

28

1      **INMATE SANDERS:**  No.  In '88 when I come to

2   California I was under the assumption from Shawnee that

3   we were going to try to reconcile, that we were going to

4   live at her mom's place while we decided whether we're

5   going to remain married or not and that she had neglected

6   to tell me that she'd been living with her boyfriend

7   almost since the day we were separated.

8      **PRESIDING COMMISSIONER SHELTON:**  Let me ask you

9   this question.  If you're adverse to a threesome as you

10   put it, why did you move into the trailer with your son

11   when she was living with another man?

12      **INMATE SANDERS:**  I didn't know she was living

13   with that man until about two days after we were there

14   and she told me.  See, her mom and her they were always

15   like reserved and her mom wasn't like that.  Her mom just

16   loved us to death, me and Alex.  And I finally -- I just

17   kept sensing something wasn't right and I finally stopped

18   and I asked, I said, you need to sit down and tell me

19   what's wrong here because there's something bugging you

20   that you're just not telling me and that's when she told

21   me that she had been living with Larry almost since the

22   day we separated in Arizona.

23      **PRESIDING COMMISSIONER SHELTON:**  So what, was he

24   under the bed for the two days or something?  I mean

25   how --

26      **INMATE SANDERS:**  No, he had left.  He told her to

27   leave because when I called and said, well, you know, I'm

29

1   here, how do I get to the house, she sent him down the

2   road packing.

3          PRESIDING COMMISSIONER SHELTON:  All right.  Have

4   I left anything out of your social history that you would

5   like to add for the record?  We've talked about -- let me

6   ask you a couple questions that I don't think I've

7   covered.  First of all, drugs and alcohol --

8          INMATE SANDERS:  I do not drink and I've never

9   done drugs.

10         PRESIDING COMMISSIONER SHELTON:  You've never

11  drank either?

12         INMATE SANDERS:  I have maybe had two beers in my

13  life and a glass of wine.

14         PRESIDING COMMISSIONER SHELTON:  So you weren't

15  under the influence of anything at the time of the

16  commitment offense?

17         INMATE SANDERS:  No, ma'am.

18         PRESIDING COMMISSIONER SHELTON:  And we discussed

19  -- who comes and visits you here?

20         INMATE SANDERS:  My mom, my dad, my brothers.  My

21  daughter come one time but they wouldn't let her in

22  because her visiting form was too out of date.

23         PRESIDING COMMISSIONER SHELTON:  So your family

24  basically visits?

25         INMATE SANDERS:  Yeah.  I have two members of the

26  church in Mountain View that come visit me all the time

27  and occasionally I have a lot of people who come into the

30

1   groups we're in that we visit through the groups, so --

2        **PRESIDING COMMISSIONER SHELTON:**  Okay. And I

3   would assume you have written correspondence and phone

4   calls with the same people?

5        **INMATE SANDERS:**  Yes, ma'am.

6        **PRESIDING COMMISSIONER SHELTON:**  Okay.

7        **INMATE SANDERS:**  Fact, they send me tapes and CDs

8   all the time of their preachings.  They're both pastors

9   that come visit.

10       **PRESIDING COMMISSIONER SHELTON:**  Okay.  I also

11  mean your family.  You have exchanged letters with them

12  as well and --

13       **INMATE SANDERS:**  Oh, yeah.  Yeah.  My mom gets

14  mad because the phone bill is expensive.

15       **PRESIDING COMMISSIONER SHELTON:**  And where do

16  your folks live now?

17       **INMATE SANDERS:**  In Stowe, Ohio.

18       **PRESIDING COMMISSIONER SHELTON:**  Okay.  All

19  right.  Did I leave anything out of your social history

20  that you could think of?

21       **INMATE SANDERS:**  No.

22       **ATTORNEY HOFFMANN:**  (inaudible).

23       **INMATE SANDERS:**  Pretty much covered it all.

24       **PRESIDING COMMISSIONER SHELTON:**  Okay.  Then what

25  we're going to do is go to Commissioner Thompson who's

26  going to review your post-commitment factors.

27       **DEPUTY COMMISSIONER THOMPSON:**  Thank you.  We're

31

1  looking at the period June 18, 2002 to today, September

2  21st, 2006.  You've been housed at San Quentin State

3  Prison, Level 2, general population, Medium A custody and

4  the mandatory classification score of 19 for any

5  (inaudible) life term.  Disciplinaries, there have been

6  none in the reporting period or in fact there are none in

7  your file.  You have received one 128 which was back on

8  March the 22nd, 1991.  Does that basically square with

9  your recollection?

10        **INMATE SANDERS:**  Yes, ma'am.

11        **DEPUTY COMMISSIONER THOMPSON:**  Okay.  Academics,

12  you've taken various classes leading or hopefully leading

13  to an AA degree.  I believe you have 21 units, maybe a

14  few more, but at least 21 at the time the file was

15  reviewed and you've completed a course on July the 6th of

16  this year, 2006, in Ethics.  And you're going to college

17  through Patton University San Quentin State Prison

18  Program. Does that square with your recollection?

19        **INMATE SANDERS:**  No, ma'am.  You're --

20        **DEPUTY COMMISSIONER THOMPSON:**  Okay.

21        **INMATE SANDERS:**  I'm missing one.  I just

22  finished the Intro to Natural Sciences, Biology 151 and I

23  got an A+ in it.

24        **DEPUTY COMMISSIONER THOMPSON:**  Well,

25  congratulations.

26        **INMATE SANDERS:**  Thank you.

27        **DEPUTY COMMISSIONER THOMPSON:**  When did you do

32

1   that?

2       **INMATE SANDERS:**  I just finished it.  The Panel

3   was at August --

4       **DEPUTY COMMISSIONER THOMPSON:**  It's not in here

5   yet. That's why.

6       **INMATE SANDERS:**  I (inaudible).

7       **DEPUTY COMMISSIONER THOMPSON:**  But that's fine.

8   Certainly have no reason to doubt you.

9       **PRESIDING COMMISSIONER SHELTON:**   Would that make

10  you having 24 units, sir?

11      **INMATE SANDERS:**  Yes, ma'am.

12      **DEPUTY COMMISSIONER THOMPSON:**  Okay.

13      **INMATE SANDERS:**  And currently I'm enrolled in

14  Ancient World History.

15      **DEPUTY COMMISSIONER THOMPSON:**  Now, it's for an

16  AA of 60 units, isn't it ultimately?

17      **INMATE SANDERS:**  Yes, ma'am.

18      **DEPUTY COMMISSIONER THOMPSON:**  So you're about

19  halfway there?

20      **INMATE SANDERS:**  (inaudible) yeah.  I --

21      **DEPUTY COMMISSIONER THOMPSON:**  Oh,

22  congratulations.

23      **INMATE SANDERS:**  Yeah.  I spent approximately a

24  year upgrading my writing skills through English 99A and

25  99B and I (inaudible) all my math requirements too for --

26  I'm going to start pre-Calculus.

27      **DEPUTY COMMISSIONER THOMPSON:**  That was one I

33

1  (inaudible).  But good luck.  Okay.  And vocational and

2  work you've been assigned through Prison Industry

3  Authority in your present if I'm right, well, you're

4  working in the infirmary as a sergeant's clerk and that

5  has been your placement for some months, possibly years.

6      **INMATE SANDERS:**  Yes, ma'am.  Yes, ma'am.

7      **DEPUTY COMMISSIONER THOMPSON:**  Is that correct?

8      **INMATE SANDERS:**  Well, there was a little break.

9  I worked two years in the joint venture program,

10  Proposition 139, a minimum wage job.  I spent two years

11  in that.  I was working in the infirmary when I went to

12  that job and then went back to the infirmary when the job

13  was done.

14      **DEPUTY COMMISSIONER THOMPSON:**  And that's where

15  you are right now?

16      **INMATE SANDERS:**  Yes, ma'am.

17      **DEPUTY COMMISSIONER THOMPSON:**  Okay.  And you're

18  getting good performance reports and your supervisors are

19  happy with what you're doing.  In the area of self-help

20  you've been involved in some 18 different programs in the

21  period that we're looking at.  It includes but is not

22  limited to in famous government phrase, Self-Esteem,

23  Communications, Vietnam Veterans Group of San Quentin,

24  (inaudible) (inaudible) Practicing Skills in Operations

25  and -- doesn't make sense to me -- but you were -- you

26  seem (inaudible) Participating Skills whatever that may

27  be, Meditation, Real Choices, Choices, Co-Dependent, Real

34

1    Choices again. There's some you've taken more than once
2    and you're currently an active member in the Real Choices
3    Group.  Criminal Thinking, Real Choices again, Relapse
4    Awareness, Parenting Skills, Operation Mom and then
5    again, an Operation Mom.  Most recent entry was February
6    the 6th of this year 2006.  Okay.  (inaudible) laudatory
7    is you've received five and the last of which was March
8    the 12th of 1998 and you also did Touch Work apparently
9    through Prison Industry (inaudible) furniture factory?
10          **INMATE SANDERS:**  Yes, ma'am.
11          **DEPUTY COMMISSIONER THOMPSON:**  And I believe you
12   were considered a lead person there?
13          **INMATE SANDERS:**  Yes, ma'am.  I was a lead man.
14          **DEPUTY COMMISSIONER THOMPSON:**  Lead man.  And the
15   certificates, you have received one for excellence in the
16   Prison Industry Authority for Outstanding Grades and Work
17   Supervisor Reports and that you got in August the 7th of
18   2002, a certificate for Completion of Project Impact.
19   What is a Man?  That was July the 10th, 2006 and a
20   certificate of completion as a facilitator for Real
21   Choices which it wasn't dated.  You have had no psych
22   treatment in the period that we are looking at and the
23   Board report of September 6th indicates you want to
24   "increase and further your education and accepts
25   responsibility for his crime and is remorseful."  All of
26   that fall with what you recognize in the same period of
27   time?

35

1          **INMATE SANDERS:**  Yes, ma'am.

2          **DEPUTY COMMISSIONER THOMPSON:**  Anything you want

3    to add to what I have touched on?

4          **INMATE SANDERS:**  I'm also a member of the Vietnam

5    Veterans of America.

6          **DEPUTY COMMISSIONER THOMPSON:**  Okay.

7          **INMATE SANDERS:**  I'm also a member of the

8    Initiating -- or the VIG Program for the Victims Group

9    and this is our program that we do.  It's 27 classes.  It

10   range anywhere from one to 16 weeks and there's 27

11   individual classes in there.

12         **PRESIDING COMMISSIONER SHELTON:**  Can I look at

13   this during our recess and get it back to you?

14         **INMATE SANDERS:**  You certainly can, ma'am.  If

15   you find anything that needs (inaudible) please let me

16   know because I made that memo.

17         **PRESIDING COMMISSIONER SHELTON:**  Like I would

18   know?

19         **DEPUTY COMMISSIONER THOMPSON:**  Congratulations.

20   This is impressive.

21         **PRESIDING COMMISSIONER SHELTON:**  I'm not going to

22   read this word by word for typos, but I want to browse

23   through it, yes.

24         **INMATE SANDERS:**  The index in the front tells you

25   what's there and --

26         **PRESIDING COMMISSIONER SHELTON:**  Okay.

27         **INMATE SANDERS:  -- i**t's just a real quick

36

1   synopsis of what each individual class is.

2           **PRESIDING COMMISSIONER SHELTON:**  I have a quick

3   question because I may have missed it.

4           **INMATE SANDERS:**  Yeah.

5           **PRESIDING COMMISSIONER SHELTON:**  Do you have any

6   vocation?

7           **INMATE SANDERS:**  No, ma'am.  I have a recognized

8   and registered retirement and Social Security.

9           **PRESIDING COMMISSIONER SHELTON:**  Do you know how

10  much that's going to bring you in?

11          **INMATE SANDERS:**  Yes, ma'am.  $798 a month on my

12  retirement and $767 on Social Security.

13          **PRESIDING COMMISSIONER SHELTON:**  And the Social

14  Security is for -- ?

15          **INMATE SANDERS:**  For when I worked all my life.

16  There's -- it's been documented.  They've been documented

17  in the Board report.

18          **PRESIDING COMMISSIONER SHELTON:**  I see that I

19  read it but --

20          **ATTORNEY HOFFMANN:**  Do you have any additional

21  documentation (inaudible)?

22          **INMATE SANDERS:**  No.

23          **PRESIDING COMMISSIONER SHELTON:**  You're 54,

24  right?

25          **INMATE SANDERS:**  55.  Well, 54.  I'll be 55 in a

26  month.

27          **PRESIDING COMMISSIONER SHELTON:**  Social Security

37

1    kicks in at what, 62?

2             **INMATE SANDERS:**  62.

3             **PRESIDING COMMISSIONER SHELTON:**  So we're talking

4    you still have eight years --

5             [Thereupon, the tape was turned over]

6             **DEPUTY COMMISSIONER THOMPSON:**  **--** little pause

7    while I turn things over.  Should I go back to where we

8    were?  I think you were discussing your psychological

9    evaluation and we were about to review the diagnostic and

10   statistical manual finding on Axis I.  You are shown as

11   having depressive disorder not otherwise specified by

12   history.  On Axis II which deals with emotional and

13   reasoning kinds of issues, there's personality disorder

14   not otherwise specified, borderline.  There is histrionic

15   -- I think it's what that is -- independent.  On Axis III

16   which relates to physical influences or problems none are

17   noted.  On Axis IV your life sentence is indicated as a

18   stressor to your general emotional and psychological

19   health.  And the global assessment of functioning is

20   placed at 70.  And they did a violence history reference.

21   Says:

22             "He stated that he was hit by his wives

23             during two of his marriages.  His first

24             wife also tried to run him over with a

25             vehicle on two occasions.  He did not

26             report these incidences to law enforcement.

27             Mr. Sanders slapped her."

38

1   And I believe that refers to what you just explained with

2   Shawnee.  You would've been downtown and you found her

3   drunk and she was trying to drive and you slapped her to

4   prevent her driving (inaudible)?

5        INMATE SANDERS:  Yes, ma'am.

6        DEPUTY COMMISSIONER THOMPSON:  Then you were

7   arrested and she was arrested and you got a fine and she

8   had a couple of days in jail and there was drugs in her

9   possession.  Now, Mr. Sanders does have a personality

10  disorder.  He is not criminally-minded -- and it says

11  things that were less than that (inaudible):  "He

12  understands the pain that he has caused family members

13  although he finds it hard to look at this too closely."

14  And just as a clarification when you committed your

15  offense that brought you here, was there one of your

16  children in the room as well?

17       INMATE SANDERS:  No, ma'am.

18       DEPUTY COMMISSIONER THOMPSON:  Oh, so the little

19  girl that got shot in the stomach and the leg that was

20  some other incident all together?

21       INMATE SANDERS:  (inaudible)

22       PRESIDING COMMISSIONER SHELTON:  That was his ex-

23  wife.

24       DEPUTY COMMISSIONER THOMPSON:  Oh, that was

25  Shawna -- or Shawnee.  I thought you -- that's where my

26  confusion started.  I thought you said it was Chris.  I

27  believe that's one of your children?

39

1          **INMATE SANDERS:**  Alex.

2          **DEPUTY COMMISSIONER THOMPSON:**  Alex.

3          **INMATE SANDERS:**  Alex was outside --

4          **DEPUTY COMMISSIONER THOMPSON:**  Well, Alex was

5    your son you had mentioned.  Well, at least I thought you

6    mentioned a daughter and the name, so that was the

7    confusion, pardon me, there.  And then your report

8    concludes that:

9          "Mr. Sanders would present a low risk of

10         future violence if he were able to have his

11         psychological needs met.  In an environment

12         where he would have checks on his tendency

13         to form intense volatile relationships he

14         would be expected to do well."

15   So if you don't get involved in anything violent or

16   intense in a relationship you should do well in the

17   community is what I make this out to say and they

18   consider you a low risk.  Is there anything you would

19   want me to address that didn't get mentioned?

20         **INMATE SANDERS:**  Nothing?

21         **ATTORNEY HOFFMANN:**  I don't believe so.  Thank

22   you.

23         **DEPUTY COMMISSIONER THOMPSON:**  Thank you.  Then I

24   will return it to the Chair.  Thank you very much.

25         **PRESIDING COMMISSIONER SHELTON:**  Okay.  Let's

26   talk about your parole plans, sir.  With regards to the

27   report here it indicates that you would like to parole to

1    where your son Michael lives and daughter Carrie?

2    **INMATE SANDERS:**  Yes, ma'am.  In an ideal

3    situation I would like that (inaudible) --

4    **PRESIDING COMMISSIONER SHELTON:**  Do they live

5    together?

6    **INMATE SANDERS:**  They share a house in Arizona

7    because they're both contract workers and as even as we

8    speak my daughter is in Lema, Ohio doing a contract job

9    right now.

10    **PRESIDING COMMISSIONER SHELTON:**  Contract as in

11    what kind of contract?

12    **INMATE SANDERS:**  She's a welder.  Very highly-

13    skilled and high demand welder too I might proudly say.

14    **PRESIDING COMMISSIONER SHELTON:**  Okay.  You also

15    have been accepted to the Sword To Plow Shares program?

16    **INMATE SANDERS:**  Yes, ma'am.

17    **PRESIDING COMMISSIONER SHELTON:**  And another

18    halfway house in Menlo Park?

19    **INMATE SANDERS:**  Yes, ma'am.

20    **PRESIDING COMMISSIONER SHELTON:**  Are you wanting

21    to hand me something?

22    **INMATE SANDERS:**  No, ma'am.  It's just the

23    copies.  If you want to see them I have (inaudible).

24    **PRESIDING COMMISSIONER SHELTON:**  I have

25    information here.

26    **INMATE SANDERS:**  Okay.

27    **PRESIDING COMMISSIONER SHELTON:**  We'll get

41

1    through to your letters in just a second.

2         **INMATE SANDERS:**  Okay.

3         **PRESIDING COMMISSIONER SHELTON:**  You indicate

4    that you would receive a railroad pension of $798 a

5    month.  At age 62 you would get Social Security.

6         **INMATE SANDERS:**  That's an error, ma'am.  I just

7    found the document.  It's --

8         **ATTORNEY HOFFMANN:**  $941 a month.

9         **INMATE SANDERS:**  $941.

10        **ATTORNEY HOFFMANN:**  -- is the rate of Social

11   Security.

12        **PRESIDING COMMISSIONER SHELTON:**  And that would

13   be at the age of 62?

14        **INMATE SANDERS:**  At 62.

15        **PRESIDING COMMISSIONER SHELTON:**  Now, when I

16   asked you if you had a vocation you said no and you threw

17   out these amounts of money.  Am I going to assume that

18   you plan to live on $800 a month between now and the time

19   you're aged 62?

20        **INMATE SANDERS:**  When I parole I will receive

21   substantial subsistence to cope until I get on my feet.

22        **PRESIDING COMMISSIONER SHELTON:**  And where would

23   that substantial subsistence come from?

24        **INMATE SANDERS:**  $3000 I saved working at the

25   minimum wage job, $3000 my mom holds in a trust and

26   $16,000 that my brother has invested in property in

27   Tennessee.

42

1          **PRESIDING COMMISSIONER SHELTON:**  So that

2    property's in Tennessee?

3          **INMATE SANDERS:**  Yes, ma'am.

4          **PRESIDING COMMISSIONER SHELTON:**  So you're

5    looking at potentially $6000?

6          **INMATE SANDERS:**  Okay.  I'm looking at

7    potentially a substantial amount more than that because

8    my brothers and I own mines in a blind trust but they

9    have all my properties from the blind trust, which

10   they're going to return to me when I parole, if I parole.

11   If not, it'll go to my estate and my children.

12         **PRESIDING COMMISSIONER SHELTON:**  Have you

13   perchance considered working?

14         **INMATE SANDERS:**  Only as a hobby.

15         **PRESIDING COMMISSIONER SHELTON:**  Why?

16         **INMATE SANDERS:**  I'm going to spend a lot of time

17   reacquainting with my family, my friends, my children, do

18   a lot of fishing.

19         **PRESIDING COMMISSIONER SHELTON:**  Okay.  And I

20   guess that pretty much covers what you have here.

21         **INMATE SANDERS:**  Okay.

22         **PRESIDING COMMISSIONER SHELTON:**  Let's talk about

23   your support letters and this is where if I don't have

24   any --

25         **INMATE SANDERS:**  I would like to go back to one

26   thing though.  This Swords to Plow Shares in this Menlo

27   Park program, that's a two year halfway house program

43

1   that --

2        **ATTORNEY HOFFMANN:**  I think we're going to go

3   through those in a moment.  She was just reviewing the

4   summary that was in your Board report --

5        **INMATE SANDERS:**  Sorry.

6        **ATTORNEY HOFFMANN:**  -- and those are letters I

7   believe are in here.

8        **INMATE SANDERS:**  Okay.

9        **ATTORNEY HOFFMANN:**  But in case they're not we'll

10  let you (inaudible).

11       **PRESIDING COMMISSIONER SHELTON:**  I'm pretty sure

12  I have them.  Let's go through what I have and then just

13  --

14       **INMATE SANDERS:**  All right.

15       **PRESIDING COMMISSIONER SHELTON:**  -- in case I

16  don't I'll take a look at them.  I have a letter dated

17  January 7th, 2006, from a lady named Judith Manley.  It's

18  a support letter.  Evidently her daughter participated in

19  a group with the Vietnam Veterans Group that you were

20  involved in.

21       **INMATE SANDERS:**  Yes, ma'am.

22       **PRESIDING COMMISSIONER SHELTON:**  I have a support

23  letter from a brother Sanders; is that correct?

24       **INMATE SANDERS:**  I have --

25       **PRESIDING COMMISSIONER SHELTON:**  K.E.?

26       **INMATE SANDERS:**  Oh, Kim or Kevin?

27       **PRESIDING COMMISSIONER SHELTON:**  Says K. E.

44

1    Sanders.

2         **INMATE SANDERS:**  Oh, that's Kevin.

3         **PRESIDING COMMISSIONER SHELTON:**  Who lives in

4    Tennessee?

5         **INMATE SANDERS:**  No, that's Kim. We're twins.

6         **PRESIDING COMMISSIONER SHELTON:**  Okay.  Evidently

7    they own a chicken farm?

8         **INMATE SANDERS:**  Yes, ma'am.  They own two

9    chicken farms and a cattle ranch.

10        **PRESIDING COMMISSIONER SHELTON:**  Okay.  So

11   anyway, they're indicating a potential residence.  April

12   2006, a letter from Lawrence Sanders verifying what your

13   other brother wrote in terms of the family farms work and

14   residence.  And I have a letter from a Grace and

15   George -- Jerry, George?

16        **INMATE SANDERS:**  George, my father.

17        **PRESIDING COMMISSIONER SHELTON:**  Father and

18   mother.  They want you to come home as well.  And I have

19   -- this looks like a completion of something, a co-

20   dependency program that you were involved in through the

21   Department of Veterans Affairs.

22        **INMATE SANDERS:**  Uh-huh.  Yes.

23        **PRESIDING COMMISSIONER SHELTON:**  Here's the

24   Swords to Plow Shares written by Donald Zamacona

25   (phonetic), December 5, 2005.  He says that you have

26   qualified for the residential program.  It addresses

27   subjects such as relapse prevention, living skills, anger

45

1   management, etcetera.  This is a drug and alcohol

2   treatment program.  Now, why would you go there if you

3   don't have any drug and alcohol problems?

4         **INMATE SANDERS:**  It's a re-entry program.  They

5   specialize in people who have drug and alcohol programs

6   but they accept anybody who is a honorably discharged

7   member of the Services.

8         **PRESIDING COMMISSIONER SHELTON:**  I see.  Then I

9   have a letter from looks like the Menlo Park program?

10        **INMATE SANDERS:**  Yes, ma'am.  It's another two

11   year.

12        **PRESIDING COMMISSIONER SHELTON:**

13        "Veterans Program provides a number of

14        services to veterans with an honorable

15        discharge.  Our main function is to help

16        people get on track through transitional

17        housing, substance abuse and 12-Step

18        meetings."

19   And evidently it just indicates that you would have a

20   spot there as well.  And I don't know that I have a --

21   let's see, I have your sister Deborah --

22        **INMATE SANDERS:**  Yes.  Yes.

23        **PRESIDING COMMISSIONER SHELTON:**  Ratikey

24   (phonetic)?

25        **INMATE SANDERS:**  Ratikey.

26        **ATTORNEY HOFFMANN:**  (Inaudible) thing?

27        **PRESIDING COMMISSIONER SHELTON:**  This one was

46

1    actually written in '05.

2          **INMATE SANDERS:**  Yeah.  It was written just prior

3    to what I thought would be my 2005 hearing.

4          **PRESIDING COMMISSIONER SHELTON:**  And it says that

5    she's supportive of your parole.  She lives -- where does

6    she live?

7          **INMATE SANDERS:**  She just lives -- just outside

8    of Kent State University, just down the road from Stowe.

9          **PRESIDING COMMISSIONER SHELTON:**  Okay.  So it

10   appears that your family's out of state, all of them?

11         **INMATE SANDERS:**  Yes, ma'am.

12         **PRESIDING COMMISSIONER SHELTON:**  Okay.  Did I

13   leave out or not have --

14         **INMATE SANDERS:**  There's many other letters in

15   there that are from the 2001 hearing and they're all

16   pretty much repetitive of (inaudible) parole.  The

17   Jericho Outreach, the San Bernardino County Jobs

18   Employment Services, the --

19         **PRESIDING COMMISSIONER SHELTON:**  Those are dated

20   2001?

21         **INMATE SANDERS:**  Yes, ma'am.

22         **PRESIDING COMMISSIONER SHELTON:**  Okay.

23         **INMATE SANDERS:**  And some are --

24         **PRESIDING COMMISSIONER SHELTON:**  They're beyond

25   my purview at this time.  Am I leaving anything out in

26   the last few years say?

27         **INMATE SANDERS:**  Did you notice my approval for

47

1   the Interstate Compact?  I'm approved to go to Arizona.

2        **PRESIDING COMMISSIONER SHELTON:**  I understand

3   that you're number five on the list or something?

4        **INMATE SANDERS:**  That's right.

5        **PRESIDING COMMISSIONER SHELTON:**  I saw that.  So

6   how long have you been number five?

7        **INMATE SANDERS:**  I don't know.  It fluctuates.

8   They put people in front of me that have a higher need to

9   go, special needs people, witness protection people, just

10  whoever --

11       **PRESIDING COMMISSIONER SHELTON:**  Have you ever

12  been higher than five?

13       **INMATE SANDERS:**  I was three one time and I've

14  been as low as seven.

15       **PRESIDING COMMISSIONER SHELTON:**  So that's an

16  indefinite situation.

17       **INMATE SANDERS:**  It's an indefinite, but I do

18  have the approval from the Department of Corrections.

19       **PRESIDING COMMISSIONER SHELTON:**  No, I understand

20  that, but there's not like within six months, within a

21  year?

22       **INMATE SANDERS:**  No, no, no.  But I want to point

23  out one thing though, that the Menlo Park and the Source

24  to Plow Shares is a maximum of two year program and they

25  do provide everything while you're there, everything from

26  shampoo to clothing and --

27       **PRESIDING COMMISSIONER SHELTON:**  How does that

Case 3:07-cv-06007-TEH    Document 5-5    Filed 05/20/2008    Page 51 of 91

48

1  program get funded?

2      **INMATE SANDERS:**  Through the Veterans

3  Administration, through private donations and the land

4  and the housing was given to them from the Veterans

5  Administration.

6      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Did I

7  cover all the letters or is there --

8      **ATTORNEY HOFFMANN:**  It's in the back here by all

9  means.  I interrupted thinking there were additional

10  support letters and I don't think you touched on the

11  opposition letter (inaudible) --

12      **PRESIDING COMMISSIONER SHELTON:**  No.  I do that

13  at a slightly different time.

14      **ATTORNEY HOFFMANN:**  Okay. Okay.

15      **PRESIDING COMMISSIONER SHELTON:**  But thank you.

16  Anything else, sir, at this time?

17      **INMATE SANDERS:**  Other than just a reiteration of

18  everything that I've had for the 2001 and the 2003

19  hearings from all the agencies in San Bernardino County,

20  all say come see us when you parole.

21      **PRESIDING COMMISSIONER SHELTON:**  Okay.

22      **INMATE SANDERS:**  And they'll set me right up.

23      **PRESIDING COMMISSIONER SHELTON:**  If there's

24  nothing else with regards to parole plans, this is a

25  portion of the hearing where we can ask questions, okay?

26      **INMATE SANDERS:**  Okay.

27      **PRESIDING COMMISSIONER SHELTON:**  And that means

49

1   the Commissioner and I can ask questions and both

2   attorneys can ask questions.  Mr. Sanders, how do you

3   feel about the fact that it looks to me like you seem to

4   find your way to very hostile and aggressive and

5   potentially murderous relationships with women?  I find

6   it more than a coincidence that you've been married to

7   three different women and all three of them have made

8   some attempt at injuring you or killing you.

9          **INMATE SANDERS:**  I'm stubborn.  I do not allow or

10  condone alcoholism, drug abuse, cheating, lying.  I

11  expect a certain openness in the marriage and it was not

12  forthcoming.  The first marriage I --

13         **PRESIDING COMMISSIONER SHELTON:**  I don't want to

14  go into the details of your marriages --

15         **INMATE SANDERS:**  Okay.

16         **PRESIDING COMMISSIONER SHELTON:**  What I'm saying

17  that it's -- I'm thinking you might need to take a look

18  at what your personal issues are because one of the

19  concerns that the psychiatrist pointed out was if you

20  continued in any kind of relationships, what direction

21  that would go on based upon history.

22         **INMATE SANDERS:**  I do not foresee and don't plan

23  on any future relationships.  I want to comment too that

24  the psychologist found that funny and again, I want to

25  reiterate that I don't plan on getting involved.  The

26  only involvement I'm --

27         **PRESIDING COMMISSIONER SHELTON:**  None of us ever

1  do, sir.

2      **INMATE SANDERS:**  I know, but this time I'm going

3  to watch my P's and Q's but I'm not going to get

4  involved.  The only relationships I intend to continue

5  with and repair are my family and my children and that's

6  going to take plenty of my time.  If and when something

7  down the road does happen, I'll deal with it then and

8  I'll deal with it in a very pragmatic way that I'll look

9  at it from a sense of everything I've ever learned and

10  every self-help and therapy group I've taken.

11      **PRESIDING COMMISSIONER SHELTON:**  I don't have any

12  other questions.  Commissioner, do you have any?

13      **DEPUTY COMMISSIONER THOMPSON:**  No, I don't but I

14  do share your concern about the volatile relationships

15  referred to.

16      **PRESIDING COMMISSIONER SHELTON:**  All right.  Miss

17  Liu, do you have any questions at this time?

18      **DEPUTY DISTRICT ATTORNEY LIU:**  Yes, please.

19      **PRESIDING COMMISSIONER SHELTON:**  Okay, go ahead.

20      **DEPUTY DISTRICT ATTORNEY LIU:**  May I proceed?

21      **PRESIDING COMMISSIONER SHELTON:**  Yes.  Please

22  address your questions to me.

23      **DEPUTY DISTRICT ATTORNEY LIU:**  Could the Board

24  ask Mr. Sanders, it looks like from the report that he

25  also had a stormy relationship with his mother as well.

26  So Mr. Sanders' plan of avoiding romantic relationship, I

27  was wondering what he was planning to do with respect to

51

1   relationships with females in his family that are
2   currently still alive.
3       INMATE SANDERS:  The incident where my -- I had
4   that stormy relationship with my mother was a one time
5   incident where she and my ex-wife, Shawnee, my victim of
6   my crime, got into a very serious almost knockdown drag
7   out shouting match and argument where it was bordering on
8   physical and I separated them.  That is the only volatile
9   -- that's the only time I raised my voice to my mother in
10  my life.
11      DEPUTY DISTRICT ATTORNEY LIU:  Well, I'm curious
12  because this is coming from an old psychiatric report
13  where it indicates that your relationship with your
14  mother has issues as well.  Have you been taking any
15  classes or are there any classes available in the system
16  to deal with your specific issues with women?  Like
17  domestic violence process, things of that sort?
18      INMATE SANDERS:  Yes, ma'am.
19      PRESIDING COMMISSIONER SHELTON:  Have you taken
20  some of those classes?
21      INMATE SANDERS:  Yes, ma'am.
22      PRESIDING COMMISSIONER SHELTON:  When?
23      INMATE SANDERS:  All throughout.  Some of them
24  are in that book right there that we've done.
25      PRESIDING COMMISSIONER SHELTON:  Okay.
26      INMATE SANDERS:  Other of them are just a one-on-
27  one dealing with select people that come into our groups,

52

1    Mary Manley, Mary Manley's mother, all of our people who

2    come in from the Veterans Administration work with us

3    one-on-one.  They deal with interpersonal relationships

4    with women, friendships with women, understanding women,

5    recognizing their inherent talents and abilities,

6    treating them as equals, as partners.

7         **DEPUTY DISTRICT ATTORNEY LIU:**  I'm sorry, I'm

8    looking at his Therapy and Self-Help Activities Meeting.

9    You could inquire of Mr. Sanders which specific one of

10   these classes he's talking about (inaudible).

11        **PRESIDING COMMISSIONER SHELTON:**  Where are you

12   looking?  Miss Liu, where are you looking?  The last

13   Board report?

14        **DEPUTY DISTRICT ATTORNEY LIU:**  Yes.  The

15   September 2006 where it lists under Section C, Therapy

16   and Self-Help Activities.  I didn't see specific ones

17   addressing those issues.

18        **DEPUTY COMMISSIONER THOMPSON:**  Would that be

19   Operation Mom?

20        **PRESIDING COMMISSIONER SHELTON:**  That'd be page

21   four of the Board report.

22        **ATTORNEY HOFFMANN:**  (conferring with Inmate) You

23   can speak about it.

24        **INMATE SANDERS:**  Oh, I'm sorry.  In the Cairo's

25   Group on 10/11/04 we spent one whole day dealing with

26   relationships with women, relationships with females,

27   relationships as I've described before of recognizing

53

1  them as partners, recognizing them as equals.  The

2  Veterans Issues Group has some of the -- in the modules

3  that -- work I give Miss Shelton, that some of the

4  modules in there deal with betterment as families, how to

5  be a better family man, how to be a better husband, how

6  to be a better father to your daughters, how to treat

7  your parents as they should be treated.  There's not one

8  single group in here that does not put emphasis on other

9  people before you and significant others is at the top of

10 the list and then children are second.

11         **DEPUTY COMMISSIONER THOMPSON:**  So (inaudible)?

12         **INMATE SANDERS:**  Yes.  Every one of these groups

13 that I've taken, Advanced Communication Skills, Working

14 With Anger, Self Esteem, especially with Parenting

15 Skills, to be a good parent you have to recognize that

16 you have to set a role model as to how -- you know, your

17 children see how you treat your wife and how you treat

18 their mother.  And you know, if you don't want to be a

19 good parent that's your choice.  Then you can leave, go

20 away, leave the people alone. But the Parenting Skills,

21 the Choices, the Self Esteem, all that works to make you

22 a better person to deal with anybody whether it's man or

23 woman.

24         **PRESIDING COMMISSIONER SHELTON:**  Other questions,

25 Miss Liu?

26         **DEPUTY DISTRICT ATTORNEY LIU:**  Yes, please.  With

27 respect to the life crime, could the Board ask Mr.

54

1    Sanders, according to the police reports he pointed a gun

2    at Shawnee's mother as well and earlier he had indicated

3    that he and her had a good relationship.  So I was

4    wondering why he had pointed the gun to Shawnee's mother

5    on that occasion. What was that about?

6          **INMATE SANDERS:**  Startled reaction.

7          **PRESIDING COMMISSIONER SHELTON:**  You want to

8    speak up (inaudible)?

9          **INMATE SANDERS:**  Oh, I'm sorry.  A startled

10   reaction.

11         **ATTORNEY HOFFMANN:**  What does that mean?

12         **INMATE SANDERS:**  She startled me and I spun.  I

13   reacted to the noise.

14         **DEPUTY DISTRICT ATTORNEY LIU:**  Another question I

15   had with respect to the life crime.  Mr. Sanders

16   indicates today that one of the reasons why he killed was

17   because he believed his son was abused.  I was wondering

18   why he never mentioned that to the police originally in

19   the police interview.

20         **INMATE SANDERS:**  I couldn't prove it at the time.

21   I didn't have any way of convincing the police

22   investigators of the belief of that without sounding like

23   I was making excuses and I did not want to drag my son

24   through any -- he was only four years old and I just

25   wasn't going to put my son through all that.

26         **DEPUTY DISTRICT ATTORNEY LIU:**  If the Board could

27   inquire with respect to his future plans, has Mr. Sanders

1  investigated how much the cost of living is in Arizona

2  and whether he would be able to pay for rent and food and

3  utilities, everything he needs on $800 a month?

4      **INMATE SANDERS:**  As I previously stated, Miss

5  Liu, the amount of money I will receive upon parole will

6  be more than substantial.

7      **DEPUTY DISTRICT ATTORNEY LIU:**  I guess my

8  question is what kind of research has he done with

9  respect to investigating what the cost of living is and

10  how does he know it's going to be enough?

11      **INMATE SANDERS:**  I compared the prices in the

12  City of San Francisco with the prices in Flagstaff,

13  Arizona.

14      **PRESIDING COMMISSIONER SHELTON:**  And what did you

15  learn?

16      **INMATE SANDERS:**  San Francisco's expensive.

17  Flagstaff is very moderate.  It's probably 35 percent

18  cheaper to live in Arizona than it is in California.

19      **DEPUTY DISTRICT ATTORNEY LIU:**  Does he know how

20  much the rent would cost, how much gas is costing these

21  days and how much food is?  I mean how close is he going

22  to be on the edge with respect to finances?

23      **INMATE SANDERS:**  The house is paid for.  There's

24  no mortgage.  The taxes are free.  It's on the Indian

25  reservation.  Gasoline, I'm not concerned about that.  I

26  don't plan on driving anywhere often. The food is like I

27  said 35 percent cheaper and I will be living with my

56

1  parents -- I'm sorry -- my --

2          **PRESIDING COMMISSIONER SHELTON:**  Children.

3          **INMATE SANDERS:**  Son and daughter -- my

4  children -- and I'm sure they won't allow me to starve.

5          **DEPUTY DISTRICT ATTORNEY LIU:**  And they are okay

6  with you living with them forever?

7          **INMATE SANDERS:**  Till I get back on my feet.  I

8  don't plan on having it be forever.  It's going to be

9  until I get settled, get arranged and make arrangements

10  to subsist on my own.  I --

11          **DEPUTY DISTRICT ATTORNEY LIU:**  I'm sorry -- for

12  the Board, correct me if I'm wrong, but you indicated

13  that you had no plans of ever getting another job.  So

14  you're limited to these funds that we are talking about

15  right here, right?

16          **INMATE SANDERS:**  Can I take a break now?

17          **PRESIDING COMMISSIONER SHELTON:**  A break?

18          **INMATE SANDERS:**  To confer.

19          **PRESIDING COMMISSIONER SHELTON:**  Oh, certainly.

20          **DEPUTY COMMISSIONER THOMPSON:**  Want me to hit

21  pause?

22          **PRESIDING COMMISSIONER SHELTON:**  No.  We'll give

23  the transcriber a break.

24          **INMATE SANDERS:**  Ma'am?  Ma'am?

25          **PRESIDING COMMISSIONER SHELTON:**  Yes, sir?

26          **INMATE SANDERS:**  My children have no objection to

27  me living with them forever.  They have made that

57

1    perfectly clear.  One of the reasons that I was approved

2    for the transfer to the State of Arizona is that my son

3    and my daughter wrote to the Department of Corrections,

4    the Interstate Unit in Sacramento, and made that

5    perfectly clear.  My son and daughter have gone many

6    times to the Interstate Unit in Arizona and required what

7    my status was and how soon before my transfer would take

8    place.  My daughter has made it perfectly clear to me in

9    all the times I've been able to talk to her on the phone

10   or in her letters that I am welcome at her house forever.

11            **DEPUTY DISTRICT ATTORNEY LIU:**  And I just have

12   one final question with the court's permission.  It looks

13   like he has made provisions for support for drug and

14   alcohol support on the outside.  I was wondering if you

15   investigated any kinds of support for anger management

16   issues in case his plan to avoid women becomes hard or

17   fails in the future, what are his plans with respect to

18   that?

19            **INMATE SANDERS:**  Could you clarify?

20            **PRESIDING COMMISSIONER SHELTON:**  I think she's

21   asking is have you developed any other kind of a support

22   group to deal with other issues.  You don't have drug and

23   alcohol issues.

24            **INMATE SANDERS:**  No, ma'am.

25            **PRESIDING COMMISSIONER SHELTON:**  But you have

26   other issues and --

27            **INMATE SANDERS:**  I have an anger issue at times,

58

1   yes.

2        **PRESIDING COMMISSIONER SHELTON:**  So she's asking

3   have you been able to set up a support group, church?  Do

4   you have some kind of support system outside the

5   institution?

6        **INMATE SANDERS:**  Yes, yes.  I have made every

7   attempt to find therapy and self-help groups in all the

8   locations that I have and respectively applied to go to.

9   There's many, many church groups in Flagstaff.  There's

10  many, many church groups at Swords To Plow Shares.  The

11  Menlo Park program is heavy with anger management and

12  understanding ways of coping with anger.  Every support

13  group I have taken in here, every support group that I'm

14  in now, there is our key theme is anger management.  The

15  anger management is based on self esteem.  It's the

16  consequences of our choices.  Whatever situations come to

17  mind I've been ten years working on controlling my anger

18  to the point now where almost now it's a shrug of the

19  shoulders and I go on because I don't allow people to

20  upset me any more.

21       **PRESIDING COMMISSIONER SHELTON:**  Thank you.

22  Anything else, Miss Liu?

23       **DEPUTY DISTRICT ATTORNEY LIU:**  No, thank you.

24       **PRESIDING COMMISSIONER SHELTON:**  Thank you very

25  much.  Miss Hoffmann?

26       **ATTORNEY HOFFMANN:**  Thank you.  One thing that

27  hasn't been brought up -- sorry -- why don't I start with

59

1    something else.  During the beginning of the hearing when

2    you were responding to questions from Commissioner

3    Shelton, you indicated that it would be hard for anyone

4    to believe that there is an excuse for the type of crime

5    that you committed.

6            **INMATE SANDERS:**  Yep.

7            **ATTORNEY HOFFMANN:**  One might hear that statement

8    and believe that your explanation -- that you view your

9    explanation as an excuse or that you think that your

10   actions were excusable and justified.

11           **INMATE SANDERS:**  Never.

12           **ATTORNEY HOFFMANN:**  Is that the case?

13           **INMATE SANDERS:**  No.  My actions are never -- my

14   actions are not justified in any way, shape or form.  I

15   don't make excuses for what happened.  All I can do is

16   work to make sure that it never, ever happens again.

17           **ATTORNEY HOFFMANN:**  The Panel and the District

18   Attorney have voiced some concern about your

19   relationships with women.  Now, specifically you have

20   been in touch with I think both Cathy and Shawnee since

21   you've been locked up; is that true?

22           **INMATE SANDERS:**  Yes.  Yep.

23           **ATTORNEY HOFFMANN:**  Now, with those -- beyond

24   other people who you may end up involved with, with those

25   two women specifically how are you going to reassure the

26   Panel that you're not going to reunite with them?

27           **INMATE SANDERS:**  Tell them no.  In no way shape

60

1    or form will I allow them back into my life.  I will not

2    ever have another relationship with them and if they

3    insist on hanging around me I will report them to the

4    police department and get a restraining order.

5         **ATTORNEY HOFFMANN:**  Thank you.  (inaudible)?

6         **INMATE SANDERS:**  Oh, where's Alex now?  Alex

7    lives in Lafayette with my brother.

8         **ATTORNEY HOFFMANN:**  Okay, thank you. That was one

9    person who was never brought up --

10        **INMATE SANDERS:**  Oh, Alex?  Oh, Alex.

11        **ATTORNEY HOFFMANN:**  -- during the hearing.  He

12   was, you know, in the yard at the time of the commitment

13   offense --

14        **INMATE SANDERS:**  Yeah.

15        **ATTORNEY HOFFMANN:**  -- what happened with Alex

16   after that?

17        **INMATE SANDERS:**  Alex is now 23 years old.  He

18   has two children.  He lives in Lafayette, Indiana.  He

19   lives down the road from my brother Mark and Mark keeps a

20   watchful out on him to make sure that they're okay.

21        **ATTORNEY HOFFMANN:**  Are you in touch with him?

22        **INMATE SANDERS:**  All the time, yeah.

23        **ATTORNEY HOFFMANN:**  Okay.  I have no further

24   questions.  Thank you.

25        **PRESIDING COMMISSIONER SHELTON:**  Okay.  Before we

26   go into closing, I want to indicate for the record that

27   we send out what are called 3042 notices to agencies that

1    might have an interest in your case, as well as to any

2    potential next of kin victims.  In this particular case I

3    have received two letters from victim's next of kin which

4    I will discuss in a minute.  Plus I also received an

5    April 5th, 2006, letter from Lieutenant Lenihan of the

6    San Bernardino County Sheriffs Department.  And basically

7    his letter indicates a brief summary of the offense and

8    indicates: "It's our department's position that Gregory

9    Sanders serves the maximum possible sentence for his

10   crime."  So in other words that department's in

11   opposition to parole at this time.  With regards to

12   victims' letters, we received a letter from Jared

13   Steinbring who is the son of the man you killed and the

14   sister of the man you killed name Laura Gutman.  And in

15   summary they're indicating that Arizona -- Mr. Steinbring

16   is indicating that where you want to parole to in Arizona

17   is a hundred miles away from where they live.  They're

18   not acceptable to that.  I'm not going to read this in

19   its entirety, but I would indicate that they find it

20   appalling that you would go there when you have other

21   places that you can go to. They don't trust you.  They

22   feel that you would do the same thing again.

23          **ATTORNEY HOFFMANN:**  Well.

24          **PRESIDING COMMISSIONER SHELTON:**  So yeah.

25   They're in opposition to parole at this time.

26          **ATTORNEY HOFFMANN:**  Okay.

27          **PRESIDING COMMISSIONER SHELTON:**  Is that

62

1  something that -- okay.  We have closing statements at

2  this time and so Miss Liu, would you like to make a

3  closing statement?

4       **DEPUTY DISTRICT ATTORNEY LIU:**  Yes, please.  May

5  I proceed?

6       **PRESIDING COMMISSIONER SHELTON:**  Yes.  Thank you.

7       **DEPUTY DISTRICT ATTORNEY LIU:**  Okay.  At this

8  time the DA's office opposes the release of Mr. Sanders.

9  We believe that he's not suitable and would present an

10  unreasonable risk of danger to the public.  With respect

11  to the life offense, we find that it is an especially

12  cold and calculated offense in that the inmate did not

13  know the victim, the male victim, Larry Steinbring, much

14  at all, that the motive appears to be quite trivial.

15  Just because he was insulted the victim was shot and

16  killed and that the conduct was calculated.  According to

17  the police report the entire incident took a matter of

18  about two minutes when Mr. Sanders walked into the room,

19  shot each victim twice and then proceeded to leave.  What

20  was especially cold about the incident besides that is

21  the statement that Mr. Sanders made after his shooting

22  the male victim Larry, it's reported that he said,

23  "life's a bitch and then you die", which indicates in

24  lack of emotion with respect to and the callousness for

25  life.  With respect to his (inaudible), I would like to

26  point out that his self-help activities are only recent.

27  Since being incarcerated since 1988 I believe his

63

1  earliest self-help activities show to be 1997 and only
2  recently in 2005 does there appear to be a lot of
3  attendance in various types of courses.  Prior to 1997
4  there does not appear to be any kind of attempt to
5  rehabilitate himself.  I'm concerned about the self-help
6  activities (inaudible) Veterans Group and they deal with
7  other issues, but I see a lack of dealing with domestic
8  violence issues, addressing anger towards women and how
9  he would behave when he is angry I think goes the crux of
10 Mr. Sanders' issues that he has not dealt with.
11 According to the psychiatrist, the psychiatrist believed
12 that he's still unable to look really closely at the fact
13 of his life crime.  Apparently they felt that he was not
14 very forthcoming with respect to all the details.  So
15 they're unable to determine the cause of his instability
16 with relationships and his reaction to relationships with
17 women.  With respect to his future plans, I find them to
18 be incredibly idealistic.  Although his plans sounds
19 good, how realistic is it to avoid women, avoid
20 relationships.  I do not find that it's realistic for him
21 to decide that he does not need any job skills, that he
22 will only need to work as a hobby in the future, that his
23 children will let him live with them for the rest of his
24 life.  His life span could easily be another 30, 40, 50
25 years and who knows how those relationships will develop
26 with his children, whether they are going to get married,
27 have kids.  He does not have a plan for dealing with

1    those contingency issues.  And a special concern is the

2    lack of support on the outside and his lack of dealing

3    with his anger management issues.  What happens next time

4    he gets jealous for whatever reason or gets angry at his

5    sister or daughter, what is his plan, how is he going to

6    deal with these situations?  I think that his plans are

7    idealistic and inadequate.  For all of those reasons we

8    then I believe then at this time he presents unreasonable

9    risk of danger to the public. Thank you.

10   **PRESIDING COMMISSIONER SHELTON:**  Thank you.  And

11   before we go to Miss Hoffmann, let's do the tapes.  We're

12   beeping.

13       [Thereupon, a new tape was inserted]

14   **PRESIDING COMMISSIONER SHELTON:**  -- and Miss

15   Hoffmann was just going to give a closing statement.

16   **ATTORNEY HOFFMANN:**  Thank you.  I will begin by

17   responding to some of the statements made by the District

18   Attorney.  First of all, it's the District Attorney's

19   position that Mr. Sanders has not programmed since 1997

20   meaning that he spent a good deal of his initial time in

21   prison according to her not doing much of anything.  That

22   is not an accurate statement.  In fact, Mr. Sanders

23   during his initial few years in prison was limited to

24   programming, not only because of his classifications for

25   and the reception issues that are in common and often

26   take someone a while to give them the yard for

27   programming is an option, he was also housed at prison

65

1   facilities that don't offer the amount of programming

2   that is offered here at San Quentin.  So he shortly after

3   coming to San Quentin in 1994 when those programs became

4   available to him, he made the decision to work and focus

5   his energy on working within the institution in order

6   that he be able to maintain his disciplinary-free status

7   which he did.  Thereafter in '97 he began programming

8   which he has done in an exemplary manner.  He has

9   participated in a number of groups.  I wish that we had

10  the time to sit here and detail what each of those groups

11  is.  Unfortunately we simply have a name of the group and

12  that name may not give us a full picture of what that

13  group offers.  For example, the Vietnam Veterans groups

14  clearly provide more services than the name of the groups

15  gives us and I think that is why Mr. Sanders has provided

16  the Commissioner with a copy of the program book so that

17  the Commissioner has the benefit of seeing what all is

18  available within that group and how Mr. Sanders has

19  gained within it.  Additionally, the District Attorney

20  looks to Mr. Sanders choosing substance abuse treatment

21  programs upon his release that don't provide him with

22  support services in the area of anger management.  I do

23  not think that the record reflects that that is in fact

24  the case.  The Swords To Plow Shares support letter

25  specifically states that they are a two-year program

26  which addresses subjects such as Relapse Prevention,

27  Living Skills, Anger Management and Stress Management to

66

1    name a few.  There are additional services that are

2    offered.  Swords To Plow Shares furthermore offers the

3    similar source of support services, including vocational

4    training and job placement.  So while those groups happen

5    to be groups that focus on substance abuse treatment,

6    they also provide numerous other support services of

7    which Mr. Sanders will avail himself.  Finally, speaking

8    to the District Attorney's closing she indicates that she

9    doesn't think that it is realistic for Mr. Sanders to

10   rely on the support of his children and that he should

11   look beyond the immediate residential plans to live with

12   them and think about his future.  Mr. Sanders indicated

13   during the hearing today that he does have some money

14   that he has saved up, letters of support from his

15   relatives, including his brothers, indicate that they

16   have other sums of money for Mr. Sanders that they have

17   invested for him and that amount has grown.  I believe

18   Mr. Sanders indicated today that there was a sum of

19   $16,000 that was currently tied up in investment

20   properties in Tennessee which Mr. Sanders will be able to

21   obtain upon his release.  I think given that his brothers

22   have been successful in investing his money since he's

23   been in here, his old age coupled with the expectation of

24   almost a thousand dollars in Social Security income when

25   he turns 62, which is just seven years from now, his

26   pension from the railroad and his family's commitment to

27   supporting him, I believe that we can have the

67

1  expectation that that support will continue.  I doubt
2  that, you know, in five years down the road one of his
3  children is going to say, hey, I'm getting married and
4  kick him out of the home.  Mr. Sanders in terms of the
5  suitability factors that the Panel is considering today
6  to determine whether or not Mr. Sanders poses a risk and
7  threat to the community upon his release, he was a high
8  school graduate before arriving in prison.  He has since
9  continued to participate in educational and academic
10  opportunities since he has been here.  He has a 3.71 GPA
11  which was actually calculated before he received that
12  recent A+ in his biology course.  He is very motivated to
13  continue his education and obtain an AA degree.  He has
14  zero disciplinary violations during his entire period of
15  incarceration and only one 128 counseling chrono.  Again,
16  he's participated in a number of self-help and has
17  received numerous laudatory chronos for that
18  participation.  He has participated in PIA Furnitures
19  well with outstanding work reports and numerous
20  certificates for facilitating and being a leader in those
21  groups as well.  The Panel didn't note, because it was
22  from 1992, but Mr. Sanders was a MAC (phonetic)
23  representative for a while which is something that is
24  only given to people who are highly respected and is a
25  very difficult position to obtain.  And while he has not
26  obtained any vocations specifically while he has been in
27  prison he has worked while he's here and was gainfully

68

1    employed before arriving in prison in the railroad

2    industry for which he will receive the pension of almost

3    $800 a month that I just mentioned and, you know, it will

4    be close to retirement age upon his release.  So it's not

5    very realistic to expect that he should obtain skills for

6    employment when that's not his priority upon his release.

7    his priority is to reunite with his family who he hasn't

8    been with since he has been here.  Reuniting with his

9    family is his priority.  Building those relationships and

10   continuing to maintain those relationships is his

11   priority and it's again unrealistic to expect that he's

12   going to go out and work.  In terms of the 2006

13   psychological evaluation, there are a couple of places

14   that I would just like to focus the Panel's attention on.

15   The psychologist does him a GAF score of 70 which may not

16   be the highest GAF score that this Panel has seen.

17   However, it doesn't seem to comport with the ultimate

18   finding that he will pose a low risk of future violence

19   and poses a low risk in the controlled setting and is

20   likely to pose a low risk of danger if he is released to

21   the community.  Given his family support and his previous

22   work history and his lack of criminal history, I would

23   expect that Mr. Sanders is going to be able to maintain

24   the skills that he has gained since he has been inside.

25   We have no reason to believe that he will not.  The one

26   factor that the Panel has expressed great concern with is

27   his relations with women for which he has done copious

69

1   amounts of self-help and group participation which he has
2   been inside and plans to continue doing when he is
3   released.  During the years he has been inside he has not
4   had any problematic or difficult relationships with his
5   children or the rest of his family or friends who have
6   maintained close relationships with.  So we have no
7   evidence to support that he may again end up in volatile
8   relationships with people when he is released.  And for
9   all of those reasons I urge the Panel to find him
10  suitable.  Thank you.
11          **PRESIDING COMMISSIONER SHELTON:**  Thank you.  All
12  right, sir.  Mr. Sanders, it's your opportunity to tell
13  us why you think you're suitable for parole.
14          **INMATE SANDERS:**  Well, I think that my
15  suitability for parole is better than some, probably not
16  as good as others.  I've worked hard to come to terms
17  with what I did, the injuries I've caused, the fact that
18  Larry's children, Jared and the twin girls, they will
19  always forever mourn their father and miss him.  I alone
20  bear that responsibility.  I also bear the weight and
21  consequences of any time it comes up in the future.  It's
22  also quite sobering to realize how at a single moment in
23  time you can do so much damage and inflict so much pain
24  and injury causing such wonderful people to become
25  victims.  The fact that I can recognize this and I could
26  recognize what went wrong, what caused it and the fact
27  that the excuses are somewhat limited which I try not to

70

1    make any excuses at all because those people did nothing
2    to me.  I was only appeasing my anger and beliefs at the
3    moment.  I based my decisions on information that it
4    could've been just the whinings of a four-year old
5    seeking attention.  But then again and now it sounds like
6    I'm blaming my son but I'm not.  I'm just recognizing all
7    the options I had at the time but I chose not to use.
8    I've spent as my attorney said copious amounts of time
9    learning how to control my reactions and control my anger
10   and to find subjects in interest and anything that will
11   take the place of getting mad or getting angry.  Rather
12   than getting angry I go read a book.  Rather than get in
13   a confrontation I just walk away.  I don't play the
14   convict game in here.  I don't have a convict mentality.
15   I choose not to subscum (phonetic) to, I'm going to be in
16   prison for the rest of my life so why should I do
17   anything?  I'm not going to do that.  Even if I spend the
18   rest of my life in prison I am not going to resort to
19   that man who once was.  I will be me now, Gregory
20   Sanders.  I was angry and jealous and selfish and I'm no
21   longer those things any more and I hope you have come to
22   realize that in reading my file and to understand that
23   I'm truly sorry for what I did.  And I'm trying to
24   convince people that not only would I be a good candidate
25   for parole but I would be a great candidate for parole
26   because I recognize what I did wrong and I know how to go
27   out there and now help people to make the right choices,

71

1   to be a mentor to people, to work with children, work

2   with men who have problems, work with my co-people that I

3   would be with to, you know, divert them to anything that

4   would keep them from getting into trouble again.  All I

5   can ask is is that, you know, that you see that I am

6   remorseful and forgiving and hope that you are forgiving

7   and hope that you find that the -- like the esteemed

8   District Attorney and yourselves, that you find me a

9   candidate for parole.  The only two things that I'd like

10  to bring up in addition to what my attorney mentioned is

11  that Dr. Nobb (phonetic) in her psych report did say that

12  I would be no risk to the community.  She stated that

13  very clearly in her report here.  And the fact that being

14  released into society, society is just a normal --

15  another form of a controlled setting where you have rules

16  and laws and morals and expectations of behavior that I

17  intend to stay with very much.  I don't want to be that

18  man I was.  I don't want to be that man that did these

19  horrible things and I have a lot to make up to a lot of

20  people.  And those are my reasons for parole, because I

21  believe that I have come to the understanding of what a

22  role model in society should be.

23          **PRESIDING COMMISSIONER SHELTON:**  Thank you, sir.

24          **INMATE SANDERS:**  You're welcome, Miss Shelton.

25          **PRESIDING COMMISSIONER SHELTON:**  We will recess

26  for deliberations. The time is 3:30 p.m.  Miss Liu, I'm

27  going to put you on mute and we'll get back to you.

72

1          **DEPUTY DISTRICT ATTORNEY LIU:**  Okay.

2                        **R E C E S S**

3                          --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

73

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                  **D E C I S I O N**

3          **DEPUTY COMMISSIONER THOMPSON:**  We are on tape on

4     both sides.

5          **PRESIDING COMMISSIONER SHELTON:**  Okay, folks.  We

6     are back in the matter of subsequent parole consideration

7     hearing for Gregory Sanders, CDC number E-05222.  Oh, I

8     am very sorry.  Miss Liu, can you hear me?

9          **DEPUTY DISTRICT ATTORNEY LIU:**  Yes, I can.

10         **PRESIDING COMMISSIONER SHELTON:**  I guess you

11    probably would like to see us as well?

12         **DEPUTY DISTRICT ATTORNEY LIU:**  That would be

13    nice.

14         **PRESIDING COMMISSIONER SHELTON:**  Okay.  We are

15    ready to start again. We are back in the parole

16    consideration matter of Gregory Sanders, CDC number E-

17    05222.  Everyone has returned to the hearing room that

18    was here during the hearing, as well as via

19    telecommunications.  Mr. Sanders, the Panel has reviewed

20    all the information received and we've relied on the

21    following circumstances in concluding that you are not

22    yet suitable for parole and you would pose an

23    unreasonable risk of danger to society or a threat to

24    public safety if released from prison.  You know, Mr.

25    Sanders, I don't want to hurt your feelings or offend you

26    but you've got one of the more unrealistic set of parole

27    **GREGORY SANDERS  E-05222  DECISION PAGE 1 9/21/06**

74

1 plans that I have ever heard in my entire life and for

2 you to sit here and tell us that you're just

3 going to retire and go fishing and live off the

4 generosity of your children for the rest of your life, I

5 find bordering offensive.

6     **INMATE SANDERS:**  I'm sorry you see that

7 (inaudible).

8     **PRESIDING COMMISSIONER SHELTON:**  Well, and I'm

9 sitting on this side of the table for a reason.

10     **INMATE SANDERS:**  Yes, ma'am.

11     **PRESIDING COMMISSIONER SHELTON:**  So one of my

12 concerns with you is that before any Board is going to be

13 considering giving you parole plans, you need to be able

14 to show that you can support yourself.

15     **INMATE SANDERS:**  Yes, ma'am.

16     **PRESIDING COMMISSIONER SHELTON:**  And you need to

17 show that you're going to deal with your issues and not

18 avoid them.  It's hardly unlikely, unless you were to

19 become a priest or a monk, that you're not going to run

20 into another woman the rest of your life. So you need to

21 deal with those issues and not run away from them.

22     **INMATE SANDERS:**  All right.

23     **PRESIDING COMMISSIONER SHELTON:**  Now, we will go

24 over some of these issues that we think you need to work

25 on and I will summarize at the end.  With regards to your

26 commitment offense, the offense was carried out in a

27 **GREGORY SANDERS   E-05222   DECISION PAGE 2   9/21/06**

75

1  specially cruel and callous manner.  I do want to tell

2  you that we -- did I say a two year denial is what we

3  gave you for this.  I don't like to leave people hanging.

4  I want to make sure I said that.  Multiple victims were

5  attacked.  These were people that semi-trusted you, an

6  estranged wife, her boyfriend, you'd been invited into

7  the home.  The offense was carried out in an execution

8  style murder.  You had a loaded gun.  You walked into a

9  room with the intent of killing somebody.  You almost hit

10  or injured a third person, a lady who cared for you, the

11  mother.  The offense was carried out in a manner which

12  demonstrate exceptionally callous disregard for human

13  suffering and your motive for the crime was trivial,

14  very, very trivial.  You said you had had it, you were

15  fed up, you were taunted, your son had been hurt.  Except

16  for you didn't pursue somebody hurting your son.  If

17  somebody hurt my child I would've pursued it by calling

18  the police and letting them do their investigation

19  because that's what they're all about.  You were far from

20  new to CPS services because allegedly you had had them

21  called on you many, many times.  I'm not sure but we went

22  through some of that already.  So many of your

23  explanations during this course of this hearing were not

24  plausible to me.  I just don't see how they fit, where

25  they matched.  I don't understand why a man that has

26  custody of a four-year old boy had 16 calls on him with

27  **GREGORY SANDERS  E-05222  DECISION PAGE 3  9/21/06**

76

1    CPS in one period of time.  At some point in time you

2    would've thought that the police or CPS would intervene

3    because it is against the law to file wrongful charges.

4    So whoever was making those allegations against you

5    should've been ordered to cease and desist long before

6    that 16th call or so.  Anyway, these conclusions are

7    drawn from the Statement of Facts that came from this

8    September 2006 Board report summary indicating that you

9    and your wife were separated, she wanted you to get back

10   together again, you had taken your son out to lunch.

11   This crime date was 2/1/88.  Saw a mark on his arm, you

12   became upset, enraged, went home, had a gun and shot your

13   estranged wife's boyfriend twice and then shot your

14   estranged wife and eventually ended up pointing the gun

15   at her mother.  With regards to your prior record,

16   obviously I think we've discussed that and disorderly

17   conduct, one suspended and one was fined back 20 years

18   ago in 1986.  With regards to your institutional

19   behavior, I commend you for not receiving any 115s and I

20   hope you don't receive any 115s.

21          **INMATE SANDERS:**  The rules are not hard to

22   follow.

23          **PRESIDING COMMISSIONER SHELTON:**  Well, you've

24   evidently had some trouble with them in the past. That's

25   why you're here.

26          **INMATE SANDERS:**  Yes, ma'am.

27   **GREGORY SANDERS   E-05222   DECISION PAGE 4   9/21/06**

77

1          **PRESIDING COMMISSIONER SHELTON:**  You have

2    received one 128.  That was in March of '91.  You have

3    done some programming.  I'm a little bit concerned -- no,

4    actually let me put it this way -- I'm a lot concerned

5    that you've

6    been in prison for 27 years?  How long has it been?

7          **INMATE SANDERS:**  18.

8          **PRESIDING COMMISSIONER SHELTON:**  18 years?  Okay,

9    my math is off today.  And you have not yet developed a

10   vocation.  You need to do a vocation.

11         **INMATE SANDERS:**  Okay.

12         **PRESIDING COMMISSIONER SHELTON:**  You could choose

13   not to.  It's not my problem.

14         **INMATE SANDERS:**  True, but --

15         **PRESIDING COMMISSIONER SHELTON:**  But you need to

16   develop a vocation.  I'm not going to sound real cold

17   here, Mr. Sanders, but what if something happened to your

18   two children tomorrow?

19         **INMATE SANDERS:**  Point taken.

20         **PRESIDING COMMISSIONER SHELTON:**  I had that

21   happen to a man, an inmate, who put all his eggs in one

22   basket for parole plans and his father died.  He had no

23   parole plans.  He had nowhere to go and in essence he had

24   to start all over again and it was pretty sad because he

25   had been doing pretty darn well.  So don't put all your

26   eggs in one basket.  Something could happen.

27   **GREGORY SANDERS  E-05222  DECISION PAGE 5  9/21/06**

78

1        **INMATE SANDERS:**  (inaudible)

2        **PRESIDING COMMISSIONER SHELTON:**  So vocation

3   means you can take care of yourself, not lean on the

4   kindness or the hearts of those around you.  So I would

5   like to see you develop some kind of a marketable skill

6   or build

7   upon whatever skills you may already have developed.  I

8   think it was recommended to you before if you have an

9   opportunity, continue with your education because it

10  certainly wouldn't hurt but that's not a directive.

11  You've got some units.  Now go into the good stuff here

12  pretty soon.  The other thing that concerned both

13  Commissioner Thompson and I was your lack of specifically

14  designed self-help programs for dealing with your issues

15  with women.  I looked through that book.  Those are very

16  general programs and the programs that are in the

17  institution are very general.  I didn't see any classes

18  that were called Domestic Violence or Interrelationships

19  With Your Spouse or Your Significant Other or whatever.

20  So if you can't find any programs offered any

21  institution, check some books out at the library that

22  have to do with personal relationships with women.

23        **INMATE SANDERS:**  All right.

24        **PRESIDING COMMISSIONER SHELTON:**  Having three

25  relationships with women the nature of which you had was

26  not a coincidence and you're not the victim.

27  **GREGORY SANDERS   E-05222   DECISION PAGE 6   9/21/06**

1       **INMATE SANDERS:**  Oh, I realize that.

2       **PRESIDING COMMISSIONER SHELTON:**  You made

3   participating choices in those relationships.

4       **INMATE SANDERS:**  Yes, ma'am.

5       **PRESIDING COMMISSIONER SHELTON:**  So what we'd

6   like to see are book reports.  You can read books about

7   those

8   kinds of situations, what you gained from it, what was

9   most important to you, what contributed to benefit you.

10  It doesn't have to be a long book report.  It can be a

11  half a page or something. I want to see something in that

12  arena because telling us that you're never going to have

13  a relationship with a woman again doesn't make a whole

14  lot of sense.  I mean, it would be so easy to avoid our

15  problems rather than deal with them head-on.  I'd rather

16  know that you're dealing with those issues because

17  someday you may meet somebody that you care about and

18  you're going to have all kinds of unresolved stuff.  The

19  psychiatric evaluation was written by Dr. Francis in

20  March of '06.  Your GAF score was 70.  That's Global

21  Assessment Functioning.  70 is not good.  70 is like C if

22  you're going to get a grade.  We look for 80s and 90s in

23  Global Assessment Functioning.  I think even your own

24  attorney made note that it seemed kind of inconsistent

25  with the rest of the psychological.  So we have requested

26  a new psych eval for you to be completed prior to your

27  **GREGORY SANDERS   E-05222   DECISION PAGE 7   9/21/06**

80

1    next hearing.

2            **INMATE SANDERS:**  Okay.

3            **PRESIDING COMMISSIONER SHELTON:**  I would go back

4    and review the psychological because there are issues in

5    there that caused me concern and I think I addressed them

6    earlier today, but I am going to indicate that I think it

7    was pages five and 6.  You know, basically the last

8    sentence there says:

9            "Mr. Sanders would present a low risk of

10           future violence" -- would, not will, would

11           -- "if he were able to have his

12           psychological needs met.  In an environment

13           where he would have checks on his tendency

14           to form intense volatile relationships he

15           would be expected to do so well.  His

16           maladaptive personality traits contribute

17           to his repeated selection of partners who

18           are emotionally unstable, untrustworthy or

19           exploitive.  Until Mr. Sanders understands

20           himself better he is at risk of becoming

21           involved with persons who will evoke

22           maladaptive behaviors and/or emotional

23           instability."

24   The doctor here is saying you need to take a look at you,

25   inside down deep.  That's what you need to start focusing

26   on.

27   **GREGORY SANDERS   E-05222   DECISION PAGE 8   9/21/06**

81

1        **INMATE SANDERS:**  Okay.

2        **PRESIDING COMMISSIONER SHELTON:**  You need to own

3   your own behavior, not run away from it, not put

4   responsibility on your children.  I have two children.

5   Never in the world would I ask them to take care of me

6   for the rest of my life.  With regards to your parole

7   plans, I guess you can tell how I feel about that.  I

8   think it's very generous of your children to want to

9   house you, but they too might like to have a life of

10  their own somebody.  They might want to get married.

11  They might want to have children.  Like I said, you need

12  to develop parole plans where you can indicate that you

13  can support yourself, not be a burden to other members of

14  your family, transferring to another state you're on a

15  waiting list for.  You do have a couple of opportunities

16  here in California.  Both of them address primarily the

17  fact that you were a Veteran for your acceptance and drug

18  and alcohol issues which evidently you don't have any.

19  So I'm a little concerned about maybe the emphasis of

20  those programs may not be what you're needing, but they

21  still would provide you a support base.  So before your

22  next hearing I would like to know that you have some

23  updated letters with regards to residential treatment if

24  that's where you're going to go.  And the other thing you

25  need probably would be -- and maybe I missed it somewhere

26  but do you have a letter from Social Security

27  **GREGORY SANDERS   E-05222   DECISION PAGE 9   9/21/06**

82

1    Administration saying what you're going to get?

2         **INMATE SANDERS:**  Yes, ma'am.

3         **PRESIDING COMMISSIONER SHELTON:**  Okay.  Make sure

4    there's an updated copy for your next hearing.

5         **INMATE SANDERS:**  Okay.

6         **PRESIDING COMMISSIONER SHELTON:**  As well as a

7    copy for the Commission to take a look at with regards to

8    your retirement benefits --

9         **INMATE SANDERS:**  I had --

10        **PRESIDING COMMISSIONER SHELTON:**  -- and any

11   support letters.

12        **INMATE SANDERS:**  I had provided the retirement

13   letter and the Social Security letter to my counselor and

14   she verified it and so noted in the report.

15        **PRESIDING COMMISSIONER SHELTON:**  That's fine.

16   But there are not copies in here.

17        **INMATE SANDERS:**  Okay.

18        **PRESIDING COMMISSIONER SHELTON:**  So I'm just

19   saying make sure there's copies available.

20        **INMATE SANDERS:**  All right.

21        **PRESIDING COMMISSIONER SHELTON:**  The more the

22   better.

23        **INMATE SANDERS:**  The more the better.

24        **PRESIDING COMMISSIONER SHELTON:**  With regards to

25   3042 notices I indicated to you obviously the District

26   Attorney's Office from San Bernardino is in opposition to

27   **GREGORY SANDERS  E-05222  DECISION PAGE 10 9/21/06**

83

1  parole as are victims next of kin, as is the sheriffs

2  department from San Bernardino County.  With regards to

3  what you've doing positively, you have done well in

4  academics.  You've received at least 24 units through

5  Patton University, just three units just recently.

6  You're a member of the Vietnam Vets of America and I did

7  review the package that you shared with us.  It's very

8  impressive.  You've been working through PIA and you are

9  currently an infirmary -- sergeant's clerk?

10        **INMATE SANDERS:**  Uh-huh.  Yes, ma'am.

11        **PRESIDING COMMISSIONER SHELTON:**  You have

12  participated in at least 18 different self-help programs

13  and you have received a variety of certificates.  But in

14  spite of those positive aspects, sir, we're still in a

15  separate decision the hearing Panel finds it's not

16  reasonable to expect that parole would be granted at a

17  hearing during the following two years.  We've discussed

18  the nature of the offense.  You know, I'm rather appalled

19  that your child would be in the neighborhood much less

20  than in the yard when you would do something like that,

21  but circumstances be they what it was, you obviously have

22  indicated that your rage took better control of your

23  thoughts --

24        **INMATE SANDERS:**  Yes, ma'am, it did.

25        **PRESIDING COMMISSIONER SHELTON:**  -- and behaviors

26  at that time.  Multiple victims were hurt and one killed

27  **GREGORY SANDERS   E-05222   DECISION PAGE 11 9/21/06**

84

1    and the offense was carried out showing callous disregard

2    for human suffering or regard for your own son, I might

3    add.  The motive for the crime was very, very trivial.

4    You know, also, Mr. Sanders, there's a point here that

5    says something about the prison has a record of violent

6    behaviorials.  Not that you have a prior record of

7    violent behavior, but every female you associate with

8    seems to have a record of violent behavior.  You have

9    been in some incredulous situations in your lifetime with

10   the three women that you were married to.  I would

11   really, really like for you to explore that pattern of

12   behavior so that you can truly once and for all remove

13   yourself from that.  So obviously you have a history of

14   tumultuous relationships as the phrase would go here.

15   The psychiatric evaluation that I referred to by Dr.

16   Francis, March '06, pages five and 6, truly indicate that

17   there's some hesitation on the part of the psychologist

18   like I read to you just a little while ago --

19        **ATTORNEY HOFFMANN:**  I think the fact that Mr.

20   Sanders just made of confusion --

21        **INMATE SANDERS:**  Dr. Inaba (phonetic).

22        **ATTORNEY HOFFMANN:**  -- is it's Dr. Inaba's who

23   did the psych evaluation.

24        **PRESIDING COMMISSIONER SHELTON:**  Oh, I'm sorry.

25   Wrote down the wrong name, I'm sorry.  Anyway, we

26   referred to that earlier so I'm not going to beat you up

27   **GREGORY SANDERS   E-05222   DECISION PAGE 12 9/21/06**

85

1    with that any more.  So I wanted to briefly give you a

2    summary of what we talked about and what we think you

3    need to work on.  And one is a vocation.  You need to

4    develop something that will support yourself.  You need

5    to be able to do that.  You know, you're 54 going on 55

6    and you're not going to get Social Security till you're

7    62 and as I told you, don't put all your eggs in one

8    basket.  You need to work on some insight issues.  Also,

9    you know, your presentation today kind of got under my

10   skin a little bit.  You're a little bit flip.  You're

11   affect is off and I think you're defensive and avoidant

12   in some arenas.  So I really wanted you -- and it could

13   be from nerves or whatever -- I want you to take a look

14   at how you present.  You know, just a hint for future

15   preparation for parole boards.  We talked about you need

16   to deal with issues of volatile relationships and improve

17   your parole plans, develop a vocation and do some more

18   self-help, book reports for example, with regards to your

19   relationships with women.

20         **INMATE SANDERS:**  Okay.

21         **PRESIDING COMMISSIONER SHELTON:**  Any comments,

22   Commissioner?

23         **DEPUTY COMMISSIONER THOMPSON:**  No.  I think

24   you've encapsulated it quite clearly and I agree.

25         **PRESIDING COMMISSIONER SHELTON:**  All right.

26         **ATTORNEY HOFFMANN:**  Can I just get one thing

27   **GREGORY SANDERS   E-05222   DECISION PAGE 13 9/21/06**

86

1    clarified?  In terms of him obtaining a vocation, he does

2    have a history of significant work on the railroad and so

3    I'm wondering if the requirement is that he actually come

4    back having earned a separate vocation while he is inside

5    or if you're simply asking that he utilize the skills

6    that he may have had beforehand to insure that he has

7    viable employment upon his release.

8          **PRESIDING COMMISSIONER SHELTON:**  You know, at

9    this point in time the history with the railroad is many,

10   many years.  I'd just as soon see him work on developing

11   a vocation or doing one that ties into with his

12   experience that he already has so that I and other Board

13   members will know that you're not going to rely solely on

14   your children or assets for resources for taking care of

15   yourself.  Like I said, anything could happen.  You could

16   become severely ill, your money may go in terms of

17   medical needs.  Who knows?  You need to have a way -- a

18   second plan, a backup plan, for taking care of yourself

19   when all else fails.

20         **INMATE SANDERS:**  I will.

21         **ATTORNEY HOFFMANN:**  Thank you.

22   ///

23   ///

24   ///

25

26

27   **GREGORY SANDERS    E-05222   DECISION PAGE 14 9/21/06**

87

1    **PRESIDING COMMISSIONER SHELTON:**  All right.  That

2    concludes this hearing today at 4:05 p.m.  We wish you

3    very much luck, Mr. Sanders.

4         **INMATE SANDERS:**  All right.  Thank you, ladies.

5

6    **PRESIDING COMMISSIONER SHELTON:**  Take care.

7                     **A J O U R N M E N T**

8                         --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON: <u>January 19, 2007</u>**

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **GREGORY SANDERS  E-05222  DECISION PAGE 15 9/21/06**

88

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**


I, CAROL FOLK, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 87, and which recording was duly recorded at SAN QUENTION STATE PRISON, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GREGORY SANDERS, CDC No. E-05222, on SEPTEMBER 21, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated December 8th, 2006, at Sacramento County, California.

*Carol Folk*

_____
CAROL FOLK
Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**